1   SEDGWICK, DETERT, MORAN & ARNOLD LLP
    JAMES S. BROWN (Bar No. 135810)
2   MARC A. KOONIN (Bar No. 166210)
    One Market Plaza
3   Steuart Tower, 8th Floor
    San Francisco, California 94105
4   Telephone: (415) 781-7900
    Facsimile: (415) 781-2635
5   james.brown@sdma.com
    marc.koonin@sdma.com
6
    DOWNS RACHLIN MARTIN PLLC
7   JOHAN W. E. MAITLAND (*pro hac vice* pending)
    JONATHAN ROSE (*pro hac vice* pending)
8   199 Main Street, P.O. Box 190
    Burlington, Vermont 05402
9   Telephone: (802)863-2375
    Facsimile: (802)658-0905
10  jmaitland@drm.com
    jrose@drm.com
11
    Attorneys for Defendants
12  PACIFIC COAST ELEVATOR CORPORATION,
    erroneously sued as AMTECH/SAN FRANCISCO
13  ELEVATOR CO., KONE, INC., MITSUBISHI ELECTRIC
    & ELECTRONICS USA, INC., erroneously sued as
14  MITSUBISHI ELEVATOR COMPANY,
    OTIS ELEVATOR COMPANY, and
15  SCHINDLER ELEVATOR CORPORATION

16                      UNITED STATES DISTRICT COURT

17                   NORTHERN DISTRICT OF CALIFORNIA

18

| 19 | JEFF BERNARDI, THOMAS BICKHAM, RANDY DAVENPORT, BRUCE DOUGLAS, MICHAEL BOUZIDIN, DAN KAESLER, RICHARD KIM, DAVID NAVA, MANUEL BUSTOS, on behalf of themselves and all persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> AMTECH/SAN FRANCISCO ELEVATOR CO.; KONE, INC.; MITSUBISHI ELEVATOR COMPANY; OTIS ELEVATOR COMPANY; SCHINDLER ELEVATOR CORPORATION; and DOES 1 through 10 inclusive, <br><br> Defendants. | CASE NO. C08-01922 WHA <br><br> **APPENDIX OF UNPUBLISHED DECISIONS, OPINION LETTER, AND SAN FRANCISCO LEGAL AUTHORITIES CITED IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT, OR, IN THE ALTERNATIVE, TO STAY PROCEEDINGS PENDING ARBITRATION** <br><br> JUDGE: The Honorable William H. Alsup <br> DATE: June 5, 2008 <br> TIME: 8:00 a.m. <br> DEPT: Courtroom 9, 19th Floor |
|---|---|

Sedgwick
DETERT, MORAN & ARNOLD LLP

                                    -1-                    CASE NO. C08-01922 WHA

1    For the convenience of the Court, Defendants Pacific Coast Elevator Corporation,

2   erroneously sued herein as Amtech/San Francisco Elevator Co., KONE, Inc., Mitsubishi Electric

3   & Electronics USA, Inc., erroneously sued herein as Mitsubishi Elevator Company, Otis Elevator

4   Company, and Schindler Elevator Corporation ("Defendants") respectfully submit true and

5   correct copies of the following unpublished federal cases, Department of Labor Wage and Hour

6   Opinion Letter, and San Francisco, California, legal materials cited in their memorandum of

7   points and authorities in support of their motion to dismiss the complaint:

8   **Description**                                                                                          **Tab No.**

9   **UNPUBLISHED FEDERAL DECISIONS**

10  *Cornn v. United Parcel Serv., Inc.*,
11    No. C03-2001 TEH, 2004 WL 2271585 (N.D. Cal. Oct. 5, 2004) ............................................ 1

12  *Fernandez v. Centerplate/NBSE, Inc.*,
      No. Civ. 04-0809, 2005 WL 3273370 (D.D.C. Aug. 1, 2005), *aff'd in relevant part*,
13    441 F.3d 1006 (D.C. Cir. 2006) ................................................................................................. 2

14  *Fuentes v. Ralph's Grocery Co.*,
15    No. CV 93-1702, 1993 WL 761992 (C.D. Cal. July 28, 1993) ................................................. 3

16  *Mendes v. W.M. Lyles Co.*,
      No. CIV F 07-1265, 2008 WL 171003 (E.D. Cal. Jan. 18, 2008) ............................................. 4

17  *Mitchell v. Mirant California, LLC*,
18    No. C 07-05847, 2008 WL 501392 (N.D. Cal. Feb. 21, 2008) ................................................. 5

19  *Nguyen v. Univ. of Calif.*,
20    No. CIV S-06-1579, 2007 WL 2993276 (E.D. Cal. Oct. 11, 2007) ........................................... 6

21  **FEDERAL WAGE AND HOUR OPINION LETTER**

22  DOL Wage & Hour Opinion Letter, FLSA2004-17NA, 2004, 2004 WL 3177901 ........................ 7

23  **SAN FRANCISCO, CALIFORNIA LEGAL AUTHORITIIES**
24
25  San Francisco, Cal. Admin. Code, Chapter 12W ............................................................................. 8
26  San Francisco, Cal. OLSE Frequently Asked Questions ................................................................. 9

27

28

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP
SF/1500871v1
APPENDIX OF UNPUBLISHED DECISIONS, OPINION LETTER, AND SAN FRANCISCO LEGAL
AUTHORITIES CITED IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

1  DATED: April 18, 2008                    SEDGWICK, DETERT, MORAN & ARNOLD LLP

2

3                                    By:_____

4                                        James S. Brown
                                         Marc A. Koonin

5                                        DOWNS RACHLIN MARTIN PLLC
                                         JOHAN W. E. MAITLAND
6                                        JONATHAN ROSE
                                         (*Pro Hac Vice*, Applications Pending)
7
                                         Attorneys for Defendants
8                                        PACIFIC COAST ELEVATOR CORPORATION,
                                         erroneously sued as AMTECH/SAN FRANCISCO
9                                        ELEVATOR CO., KONE, INC., MITSUBISHI
                                         ELECTRIC & ELECTRONICS USA, INC.,
10                                       erroneously sued as MITSUBISHI ELEVATOR
                                         COMPANY, OTIS ELEVATOR COMPANY, and
11                                       SCHINDLER ELEVATOR CORPORATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**SEDGWICK**
DETERT, MORAN & ARNOLD LLP
28

                                              -3-                    CASE NO. C08-01922 WHA

APPENDIX OF UNPUBLISHED DECISIONS, OPINION LETTER, AND SAN FRANCISCO LEGAL
                            AUTHORITIES CITED IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# Tab 1

## Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2271585 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271585)**

Page 1

**H**
Cornn v. United Parcel Service, Inc.
N.D.Cal.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
James CORNN, et al., Plaintiffs,
v.
UNITED PARCEL SERVICE, INC., Defendant.
**No. C03-2001 TEH.**

Oct. 5, 2004.

Wendy C. York, Curtis Brooks Cutter, Kershaw
Cutter Ratinoff & York, Sacramento, CA, for
Plaintiffs.
E. Jeffrey Grube, Esq., Annette Marie Gammon,
Paul, Hastings, Janofsky & Walker LLP, San Fran-
cisco, CA, Scott Edward Cole, Scott Cole & Asso-
ciates, APC, Oakland, CA, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN
PART UPS'S MOTION FOR SUMMARY JUDG-
MENT;SCHEDULING ORDER FOR UPS'S MO-
TION TO STRIKE*

HENDERSON, J.
**\*1** This matter came before the Court on Monday,
October 4, 2004, on Defendant UPS's motion for
summary judgment. In that motion, UPS argued
that all of Plaintiffs' claims are preempted under §
301 of the Labor Management Relations Act
("LMRA"), 29 U.S.C. § 185(a), and that two of
Plaintiffs' claims are preempted by the federal Mo-
tor Carrier Act, 49 U.S.C. §§ 31502*et seq.* For the
reasons stated on the record immediately following
the hearing, the Court GRANTED IN PART and
DENIED IN PART UPS's motion. This order
provides a brief written summary of the Court's oral
ruling.

As an initial matter, the Court disagrees with
Plaintiffs' contention that a claim based on a non-
negotiable state-law right can never be preempted.
The Supreme Court has already rejected that pro-

position, noting that "[i]t is conceivable that a State
could create a remedy that, although nonnegotiable,
nonetheless turned on the interpretation of a col-
lective-bargaining agreement for its application.
Such a remedy would be pre-empted by §
301."*Lingle v. Norge Div. of Magic Chef, Inc.,* 486
U.S. 399, 407 n. 7, 108 S.Ct. 1877, 100 L.Ed.2d
410 (1988). Thus, the same general rule applies, re-
gardless of whether the right at issue is nonnegoti-
able:

If the plaintiff's claim cannot be resolved without
interpreting the applicable CBA [collective bargain-
ing agreement] ... it is preempted. Alternatively, if
the claim may be litigated without reference to the
rights and duties established in a CBA ... it is not
preempted. The plaintiff's claim is the touchstone
for this analysis; the need to interpret the CBA
must inhere in the nature of the plaintiff's claim. If
the claim is plainly based on state law, § 301 pree-
mption is not mandated simply because the defend-
ant refers to the CBA in mounting a defense.

*Cramer v. Consol. Freightways Inc.,* 255 F.3d 683,
691 (9th Cir.2001) (en banc) (citations omitted).
Similarly, a claim based on state law is not preemp-
ted simply because a court must interpret the CBA
"to determine the proper damages." *Lingle,* 486
U.S. at 413 n. 12. Nor is a "creative linkage
between the subject matter of the claim and the
wording of a CBA provision" sufficient to mandate
preemption; instead, "the proffered interpretation
argument must reach a reasonable level of credibil-
ity."*Cramer,* 255 F.3d at 692.

Given this framework, the Court finds that
Plaintiffs' first claim requires interpretation of a
CBA and is therefore preempted under § 301 of the
LMRA. The Court cannot determine whether UPS
complied with its statutory obligations to pay
Plaintiffs' wages without interpreting the CBAs to
determine what was actually agreed upon. Plaintiffs
claim a nonnegotiable right, independent of the
CBAs, to be paid for all work performed, but the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2271585 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271585)

Page 2

code sections they rely on to establish that right only require an employer to pay an employee all wages as agreed upon.[FN1]*See, e.g.,*Cal. Labor Code § 222 (making it unlawful to withhold from an employee "any part of the wage *agreed upon*" (emphasis added)); Cal. Labor Code § 223 (making it unlawful to "secretly pay a lower wage while purporting to pay the wage designated by statute or *by contract*" (emphasis added)); *see also*Cal. Labor Code § 200 (defining "wages" to include "all amounts for labor performed," and defining "labor" to include "labor, work, or service whether rendered or performed *under contract, subcontract, partnership, station plan, or other agreement* if the labor to be paid for is performed personally by the person demanding payment" (emphasis added)). The level of interpretation required to resolve Plaintiffs' first claim goes beyond the need to refer to the CBA to determine the appropriate wage rate or damages. In addition to determining the wage rate, the Court would have to interpret the CBA-including the "fair day's work for a fair day's pay" provision-to determine the scope of work and other terms and conditions of employment agreed upon by Plaintiffs and UPS. As a result, Plaintiffs' first claim is preempted by the LMRA.

> FN1. In the amended complaint, Plaintiffs' first claim also asserts that UPS failed to pay overtime to Plaintiffs. *E.g.,* First Am. Compl. ¶ 31. However, in their opposition papers, Plaintiffs abandoned that claim, writing that "*none of Plaintiffs' claims are based on a state right to overtime pay."*Opp'n at 2.

**\*2** However, UPS's arguments regarding Plaintiffs' other claims are unpersuasive. The company has failed to persuade the Court that it would be necessary to interpret the CBAs to adjudicate Plaintiffs' independent statutory claims regarding an itemized statement of deductions or meal and rest periods. Accordingly, Plaintiffs' second through fourth claims are not preempted by the LMRA.

Nor has UPS demonstrated that preemption applies

to Plaintiffs' fifth claim, for violation of California Business and Professions code section 17200. UPS hinged its argument on the Court's finding that all of Plaintiffs' other claims were preempted. However, as just discussed, the Court does not find that Plaintiffs' second through fourth claims are preempted.

The Court further finds that exemption under the federal Motor Act has no impact on this case. Plaintiffs do not claim overtime pay, and UPS has failed to establish that exemption from overtime laws means that an employee cannot make other claims for unpaid wages.

In sum, the Court GRANTS IN PART and DENIES IN PART UPS's motion for summary judgment. As discussed at the hearing and in this order, the motion is GRANTED as to Plaintiffs' first claim but DENIED as to all other claims.

After the hearing on UPS's summary judgment motion, the Court also discussed a briefing schedule for UPS's intended motion to strike declarations filed in conjunction with Plaintiffs' reply to their class certification motion. As agreed at the hearing, UPS shall file its motion on or before October 18, 2004. Plaintiffs shall file their opposition on or before November 1, 2004, and UPS shall file its reply on or before November 8, 2004. To accommodate the Court's calendar, the hearing will take place on Monday, November 29, at 10:00 AM, rather than on November 22, as discussed at the hearing. If the parties are unavailable on this new date, they shall meet and confer and call the Court's deputy clerk with proposed alternative dates.

IT IS SO ORDERED.

N.D.Cal.,2004.
Cornn v. United Parcel Service, Inc.
Not Reported in F.Supp.2d, 2004 WL 2271585 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Delivery Summary Report for KOONIN,MARC A 4448526**

| | |
|---|---|
| Date/Time of Request: | Thursday, April 17, 2008 15:34 Central |
| Client Identifier: | 4891-000001 |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 119 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 2271585 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271585)

**H**
Cornn v. United Parcel Service, Inc.
N.D.Cal.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
James CORNN, et al., Plaintiffs,
v.
UNITED PARCEL SERVICE, INC., Defendant.
No. C03-2001 TEH.

Oct. 5, 2004.

Wendy C. York, Curtis Brooks Cutter, Kershaw
Cutter Ratinoff & York, Sacramento, CA, for
Plaintiffs.
E. Jeffrey Grube, Esq., Annette Marie Gammon,
Paul, Hastings, Janofsky & Walker LLP, San Fran-
cisco, CA, Scott Edward Cole, Scott Cole & Asso-
ciates, APC, Oakland, CA, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN
PART UPS'S MOTION FOR SUMMARY JUDG-
MENT;SCHEDULING ORDER FOR UPS'S MO-
TION TO STRIKE*

HENDERSON, J.
**\*1** This matter came before the Court on Monday,
October 4, 2004, on Defendant UPS's motion for
summary judgment. In that motion, UPS argued
that all of Plaintiffs' claims are preempted under §
301 of the Labor Management Relations Act
("LMRA"), 29 U.S.C. § 185(a), and that two of
Plaintiffs' claims are preempted by the federal Mo-
tor Carrier Act, 49 U.S.C. §§ 31502*et seq.* For the
reasons stated on the record immediately following
the hearing, the Court GRANTED IN PART and
DENIED IN PART UPS's motion. This order
provides a brief written summary of the Court's oral
ruling.

As an initial matter, the Court disagrees with
Plaintiffs' contention that a claim based on a non-
negotiable state-law right can never be preempted.
The Supreme Court has already rejected that pro-

position, noting that "[i]t is conceivable that a State
could create a remedy that, although nonnegotiable,
nonetheless turned on the interpretation of a col-
lective-bargaining agreement for its application.
Such a remedy would be pre-empted by §
301."*Lingle v. Norge Div. of Magic Chef, Inc.,* 486
U.S. 399, 407 n. 7, 108 S.Ct. 1877, 100 L.Ed.2d
410 (1988). Thus, the same general rule applies, re-
gardless of whether the right at issue is nonnegoti-
able:

If the plaintiff's claim cannot be resolved without
interpreting the applicable CBA [collective bargain-
ing agreement] ... it is preempted. Alternatively, if
the claim may be litigated without reference to the
rights and duties established in a CBA ... it is not
preempted. The plaintiff's claim is the touchstone
for this analysis; the need to interpret the CBA
must inhere in the nature of the plaintiff's claim. If
the claim is plainly based on state law, § 301 pree-
mption is not mandated simply because the defend-
ant refers to the CBA in mounting a defense.

*Cramer v. Consol. Freightways Inc.,* 255 F.3d 683,
691 (9th Cir.2001) (en banc) (citations omitted).
Similarly, a claim based on state law is not preemp-
ted simply because a court must interpret the CBA
"to determine the proper damages." *Lingle,* 486
U.S. at 413 n. 12. Nor is a "creative linkage
between the subject matter of the claim and the
wording of a CBA provision" sufficient to mandate
preemption; instead, "the proffered interpretation
argument must reach a reasonable level of credibil-
ity."*Cramer,* 255 F.3d at 692.

Given this framework, the Court finds that
Plaintiffs' first claim requires interpretation of a
CBA and is therefore preempted under § 301 of the
LMRA. The Court cannot determine whether UPS
complied with its statutory obligations to pay
Plaintiffs' wages without interpreting the CBAs to
determine what was actually agreed upon. Plaintiffs
claim a nonnegotiable right, independent of the
CBAs, to be paid for all work performed, but the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                  Page 2
Not Reported in F.Supp.2d, 2004 WL 2271585 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271585)**

code sections they rely on to establish that right only require an employer to pay an employee all wages as agreed upon.[FN1] *See, e.g.,* Cal. Labor Code § 222 (making it unlawful to withhold from an employee "any part of the wage *agreed upon*" (emphasis added)); Cal. Labor Code § 223 (making it unlawful to "secretly pay a lower wage while purporting to pay the wage designated by statute or *by contract*" (emphasis added)); *see also* Cal. Labor Code § 200 (defining "wages" to include "all amounts for labor performed," and defining "labor" to include "labor, work, or service whether rendered or performed *under contract, subcontract, partnership, station plan, or other agreement* if the labor to be paid for is performed personally by the person demanding payment" (emphasis added)). The level of interpretation required to resolve Plaintiffs' first claim goes beyond the need to refer to the CBA to determine the appropriate wage rate or damages. In addition to determining the wage rate, the Court would have to interpret the CBA-including the "fair day's work for a fair day's pay" provision-to determine the scope of work and other terms and conditions of employment agreed upon by Plaintiffs and UPS. As a result, Plaintiffs' first claim is preempted by the LMRA.

> FN1. In the amended complaint, Plaintiffs' first claim also asserts that UPS failed to pay overtime to Plaintiffs. *E.g.,* First Am. Compl. ¶ 31. However, in their opposition papers, Plaintiffs abandoned that claim, writing that "*none of Plaintiffs' claims are based on a state right to overtime pay.*" Opp'n at 2.

**\*2** However, UPS's arguments regarding Plaintiffs' other claims are unpersuasive. The company has failed to persuade the Court that it would be necessary to interpret the CBAs to adjudicate Plaintiffs' independent statutory claims regarding an itemized statement of deductions or meal and rest periods. Accordingly, Plaintiffs' second through fourth claims are not preempted by the LMRA.

Nor has UPS demonstrated that preemption applies

to Plaintiffs' fifth claim, for violation of California Business and Professions code section 17200. UPS hinged its argument on the Court's finding that all of Plaintiffs' other claims were preempted. However, as just discussed, the Court does not find that Plaintiffs' second through fourth claims are preempted.

The Court further finds that exemption under the federal Motor Act has no impact on this case. Plaintiffs do not claim overtime pay, and UPS has failed to establish that exemption from overtime laws means that an employee cannot make other claims for unpaid wages.

In sum, the Court GRANTS IN PART and DENIES IN PART UPS's motion for summary judgment. As discussed at the hearing and in this order, the motion is GRANTED as to Plaintiffs' first claim but DENIED as to all other claims.

After the hearing on UPS's summary judgment motion, the Court also discussed a briefing schedule for UPS's intended motion to strike declarations filed in conjunction with Plaintiffs' reply to their class certification motion. As agreed at the hearing, UPS shall file its motion on or before October 18, 2004. Plaintiffs shall file their opposition on or before November 1, 2004, and UPS shall file its reply on or before November 8, 2004. To accommodate the Court's calendar, the hearing will take place on Monday, November 29, at 10:00 AM, rather than on November 22, as discussed at the hearing. If the parties are unavailable on this new date, they shall meet and confer and call the Court's deputy clerk with proposed alternative dates.

IT IS SO ORDERED.

N.D.Cal.,2004.
Cornn v. United Parcel Service, Inc.
Not Reported in F.Supp.2d, 2004 WL 2271585 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 2

Westlaw.

Not Reported in F.Supp.2d                                                                                            Page 1
Not Reported in F.Supp.2d, 2005 WL 3273370 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3273370)**

▷
Fernandez v. Centerplate/NBSE, Inc.
D.D.C.,2005.
Only the Westlaw citation is currently available.
    United States District Court, District of Columbia.
            Esther FERNANDEZ Plaintiff,
                        v.
    CENTERPLATE/NBSE, INC. Defendant.
            **No. Civ.A. 04-0809RBW.**

                    Aug. 1, 2005.

Barbara B. Hutchinson, New Carrollton, MD, for
Plaintiff.
Brian M. Hudson, Venable LLP, Washington, DC,
for Defendant.

            *MEMORANDUM OPINION*

WALTON, J.
**\*1** Currently before the Court is Defendant Center-
plate/NBSE, Inc.'s Motion to Dismiss Complaint or
Alternatively for Summary Judgment ("Def.'s
Mot.") [D.E. # 6]. For the following reasons, the
Court grants the defendant's motion to dismiss the
complaint.

                    I. Background

The plaintiff, a resident of Virginia, has brought
suit against her employer, Centerplate/NBSE
("Centerplate"), seeking damages stemming from
Centerplate's alleged failure to pay the plaintiff
overtime compensation in violation of the Fair
Labor Standards Act ("FLSA" or the "Act"), 29
U.S.C. §§ 207, 216(b) (2000). Complaint
("Compl.") ¶¶ 1, 4.[FN1] At all times relevant to this
matter, Centerplate was the plaintiff's employer
within the meaning of the FLSA. 29 U.S.C. §
203(d) (2000); Compl. ¶ 2. Centerplate is a con-
tractor for and agent of the Washington Convention
Authority in Washington, D.C. Compl. ¶ 2. The
plaintiff purports that the Court has jurisdiction
over this case pursuant to 28 U.S.C. § 1331

*Id.* ¶ 4.

From 1983 until December 2002, the plaintiff was
employed by the defendant as a waiter and banquet
captain, subject to a collective bargaining agree-
ment.*Id.* ¶ 5; Statement of Material Facts Not in
Dispute ¶ 3. The Hotel and Restaurant Employees
Local 25 Union, to which the plaintiff claims she
was a member, reached a settlement agreement with
Centerplate regarding overtime hours worked by
Centerplates' employees. Plaintiff's Memorandum
in Support of Plaintiff's Statement of Genuine Is-
sues and Opposition to Centerplate/NBSE, Inc.'s
Motion to Dismiss the Complaint or Alternatively
for Summary Judgment ("Pl.'s Mem.") at 4; *see*
Pl.'s Mem., Exhibit ("Ex.") IB (Letter from Laura
Brown to Current or Former Banquet Employees of
Centerplate dated December 11, 2003) at 1. The
employees' claims in the union dispute were based
on Centerplate's alleged failure to compensate them
for hours worked in excess of eight hours per day.
Def.'s Mot.; Ex. 1 (Affidavit of Jeff Witt dated
September 17, 2004) at 1. The plaintiff allegedly at-
tempted to file a claim based on the Union's settle-
ment agreement, but was denied the right to make
such a claim by a Union representative. Pl.'s Mem.
at 2. The plaintiff's claim was based on her position
that from March 1, 2000 through December 31,
2002, she was scheduled to work in excess of eight
hours per day and forty hours per week, and that
she did not receive overtime payment for the
"excess hours worked." Compl. ¶ 7. On February
27, 2004, plaintiff's counsel sent a letter to the de-
fendant in attempt to obtain the overtime payments
to which the plaintiff believed she was entitled.
Compl. ¶ 8; Pl.'s Mem. at 2; Ex. 1C (Letter from
Barbara Hutchinson to George McDonald dated
February 27, 2004). The plaintiff alleges that the
defendant refused to acquiesce to her requests for
overtime pay. Compl. ¶ 8.

The plaintiff does not allege that she was not com-
pensated at the rate of time and one-half for the
hours she worked in excess of forty per week as re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3273370 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3273370)**

quired by the FLSA. Plaintiff's Statement of Genuine Issues in Support of and in Opposition to Centerplate/NBSE, Inc.'s Motion to Dismiss the Complaint or Alternatively for Summary Judgment ("Pl.'s Statement") ¶ 7. She does, however, claim that she is entitled to compensation for hours worked in excess of eight hours per day. *Id.* ¶¶ 6, 8. Hence, the issue for this Court to resolve is whether the defendant owes the plaintiff compensation for hours she worked in excess of eight hours per day under the terms of the collective bargaining agreement, and if so, whether failure to make the payments constitutes a violation of the FLSA. *Id.* ¶¶ 6-7.The plaintiff is seeking an award of wages for overtime compensation, plus interest, for the overtime hours allegedly worked between March 1, 2000 and December 31, 2002. Compl. ¶ 10. She is also seeking liquidated damages, attorney's fees and costs for the expenses incurred prosecuting this action. *Id.*

**\*2** The defendant, on the other hand, has filed a motion to dismiss, or alternatively a motion for summary judgment, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56, asserting that the complaint fails to state a claim under the FLSA.[FN2]Memorandum of Points and Authorities in Support of Defendant Centerplate/NBSE, Inc.'s Motion to Dismiss Complaint or Alternatively for Summary Judgment at 1 ("Def.'s Mem.") [D.E. # 6]. The Court will resolve this motion pursuant to Fed.R.Civ.P. 12(b)(1), based on the plaintiff's failure to demonstrate that this Court has subject matter jurisdiction in this case.

## II. Standard of Review

When considering whether a court has subject matter jurisdiction, Federal Rule of Civil Procedure 12(b)(1)"imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."*Fowler v. District of Columbia,* 122 F.Supp.2d 37, 40 (D.D.C.2000) (citation omitted). Whether a court has jurisdiction is a threshold issue that must be decided before the

court can consider merit-based issues. *See Artis v. Greenspan,* 223 F.Supp.2d 149, 155 (D.D.C.2002). It is the plaintiff who bears the burden of demonstrating that the court has jurisdiction. *Fowler,* 122 F.Supp.2d at 39-40 (citing *D.C. Ret. Bd. v. United States,* 657 F.Supp. 428, 431 (D.D.C.1987)). Moreover, in considering a motion to dismiss for lack of subject matter jurisdiction, "[t]he nonmoving party is entitled to all *reasonable* inferences that can be drawn in her favor."*Artis v. Greenspan,* 158 F.3d 1301, 1306 (D.C.Cir.1998) (citation omitted); *seealsoRosell v. Wood,* No. CIV.A.01-1355 RCL, 2002 WL 32396260, \*1 (D.D.C. Mar.27, 2002). Additionally, in resolving a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), the Court can consider matters outside of the pleadings to assure itself that it has jurisdiction over the case. *Fowler,* 122 F.Supp.2d at 40;*Artis,* 223 F.Supp.2d at 152.

## III. Legal Analysis

The plaintiff contends that the court has jurisdiction in this case pursuant to 28 U.S.C. § 1331, Compl. ¶ 4, which confers jurisdiction to federal courts in cases involving a federal question. As already indicated, the plaintiff claims that the defendant violated the FLSA by failing to pay her overtime compensation. Compl. ¶ 4. Section 216(b) of the FLSA confers jurisdiction upon the federal courts to hear cases brought under section 207 of the Act. 28 U.S.C. § 216(b). The defendant asserts that the plaintiff has failed to state a claim under the FLSA because she is seeking only to recover overtime compensation for time worked in excess of eight hours per day. Def.'s Mem. at 1. Thus, as the FLSA only requires employers to pay employees overtime pay for work performed in excess of forty hours per week, 28 U.S.C. § 207(a)(1) (2000), and has no increased payment requirement for hours worked in excess of eight per day, the defendant argues that this Court does not have jurisdiction in this matter. Def.'s Mem. at 1.

**\*3** As noted, the plaintiff concedes that the defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:08-cv-01922-WHA    Document 14    Filed 04/18/2008    Page 13 of 80

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3273370 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3273370)**

Page 3

ant paid her time and one-half her normal hourly wages for all hours worked above forty per week. Pl.'s Statement ¶ 7. The defendant argues that because the plaintiff received the overtime compensation required by the FLSA, and is only seeking damages for compensation she may be entitled to receive under a contract, she does not have a claim under the Act. *See* Centerplate/NBSE's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss Complaint or Alternatively for Summary Judgment at 2 ("Def.'s Reply"). Therefore, the defendant concludes that the complaint must be dismissed for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Def.'s Mem. at 1.

In her opposition to the defendant's motion to dismiss, the plaintiff contends that she sometimes worked twelve and fourteen hour days, and is entitled to overtime compensation for the hours she worked in excess of eight hours per day pursuant to the FLSA. Pl.'s Mem. at 1-2. While the plaintiff acknowledges that the FLSA requires an employer to pay an employee overtime compensation for any hours worked in excess of forty per week, she also notes that the Act "do[es] not relieve an employer of any obligation the employer assumes due to a contract or any other obligation imposed by law to pay premium rates for work in excess of a daily standard."*Id.* at 3 (citing 29 C.F.R. § 788.102 (2005)).[FN3] The plaintiff construes this provision to mean that she has a cause of action to enforce her collective bargaining agreement pursuant to the FLSA because the Act does not relieve an employer of its contractual duties.*Id.* at 3, 7.

Guidance for determining whether this Court has jurisdiction in this is case is found in *Sheppard v. Cornelius,* 302 F.2d 89 (4th Cir.1962). In *Sheppard,* the plaintiffs sought payment for overtime compensation to which they believed they were entitled pursuant to a contract with their employer that was governed by the National Bituminous Coal Agreement of 1950. *Id.* at 90.The plaintiffs brought the action under the FLSA even though they had not worked more than forty hours per week. *Id.* The

district court granted summary judgment for the employer, finding that the plaintiff did not have a claim under the FLSA, and consequently, there was no federal jurisdiction.*Id.* In affirming the district court, the Fourth Circuit held that the FLSA "confer[ed] no jurisdiction upon th[e c]ourt to adjudicate contractual claims for wages unless such adjudication [was] necessary to enforce[ ] ... the Act."*Id.* The court reasoned that "[i]f ... the plaintiffs' employment was governed by the National Bituminous Coal Agreement of 1950, they may have an action founded upon the contract for unpaid wages, but they have not shown a violation of the Fair Labor Standards Act."*Id.* The *Sheppard* court further clarified that although the plaintiffs may have had a valid claim against their employer, the action had to be pursued in state court rather than in federal court. *Id.* at 91.

**\*4** The decision by another member of this Court in *Marsans v. Communications Workers of America,* No. CIV.A.87-0782(RCL), 1989 WL 43831, at \*9 (D.D.C. Apr. 19, 1989) is also instructive. In *Marsans,* the plaintiffs initially sought overtime payment from their employer, claiming a breach of their collective bargaining agreement and a violation of the FLSA. *Id.* at \*1. The collective bargaining agreement specified that the employees would be compensated at the rate of time and one-half for all hours worked after their "regular tour of duty." *Id.* The agreement further indicated that the work week would consist of five six and one-half hour days. *Id.* Based on these provisions, the employees believed they were entitled to overtime compensation for all hours worked in excess of thirty-two and one-half per week pursuant to both their collective bargaining agreement and the FLSA. *Id.* The *Marsans* Court separately examined the collective bargaining agreement breach claims and the FLSA claims, and applied entirely different standards to each set of claims. *Id.* at \*6, 9. Thus, whether there was a violation of the collective bargaining agreement had no impact on the Court's assessment of the FLSA claims. *Id.* at \*9. Moreover, the provisions of the collective bargaining agreement relat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3273370 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3273370)

ing to overtime compensation were deemed irrelevant to the Court's analysis of the FLSA claims. *Id.* Ultimately, the defendant conceded "[w]holly apart from the collective bargaining agreement," that it may have been required to pay the employees for hours worked in excess of forty per week under section 207 of the FLSA. *Id.* The plaintiffs accepted the defendant's apparent interpretation of the FLSA, and therefore excluded their claims for hours worked in excess of thirty-two and one-half but less than forty per week from their complaint, "thereby limiting the claim to hours worked in excess of forty per week."*Id.* Accordingly, on grounds independent from whether the plaintiff could recover on their breach of the collective bargaining agreement claim, the Court in *Marsans* granted partial summary judgment in favor of the defendant on the plaintiffs' FLSA "claim [for] compensation due for overtime hours ... [as to any weeks when the plaintiffs worked] less than forty hours per week[.]"*Id.* at *11.

Similarly, the court in *Dufrene v. Browning-Ferris, Inc.*, 207 F.3d 264, 269 (5th Cir.2000) distinguished employees' claims under a collective bargaining agreement from a claim under the FLSA. The employees' claim brought pursuant to the FLSA asserted that their employer's method of calculating overtime violated the FLSA. *Id.* at 266.They additionally argued that their collective bargaining agreement entitled them to "an independent right to overtime pay after an eight-hour day...."*Id.* at 269.The district court granted summary judgment in favor of the defendant, holding that the employer's overtime calculation method did not violate the FLSA. *Id.* at 266.The *Dufrene* court affirmed the district court, concluding that the employees' claim that their collective bargaining agreement gave them a separate right to overtime compensation "concern[ed], at best, a violation of the [collective bargaining agreement], *not* the FLSA."*Id.* The Court emphasized that the action before the district court was "*not* to enforce the [collective bargaining agreement]." *Id.*

**\*5** Likewise, in a decision affirmed by the Second Circuit, *Timony v. Todd Shipyards Corp.*, 59 F.Supp. 779, 779-80 (S.D.N.Y.1945), *aff'd,*151 F.2d 336 (2d Cir.1945), the plaintiff brought an action against his employer in federal court under both his labor agreement and the FLSA, claiming that a provision of his labor agreement had been breached. The provision provided that "[i]f an employee ... is required to work continuously [for] more than five hours without [a break for a meal], ... he shall be entitled to receive a premium for all time worked beyond such five hours [at an increased] rate of pay...."*Id.* at 780.The plaintiff alleged that the provisions of the FLSA were incorporated into his labor agreement because the purpose of the FLSA is to "eliminate labor conditions detrimental to the general welfare of workers," and a requirement that employees work for more than five hours without a break for a meal would be dangerous to the employees, and thus contrary to the purposes underlying the FLSA. *Id.* The plaintiff argued that he was entitled to the increased pay called for in his labor agreement as well as damages under the FLSA. *Id.* at 781.The court rejected this argument, finding that the claim brought under the FLSA did not " 'really and substantially involve a controversy' under the ... Act[,]" but instead advanced only a violation of the plaintiff's labor agreement. *Id.* (quoting *Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913)). The court reasoned that "[s]urely, the[ ] allegations [did] not state a claim for unpaid minimum wages or unpaid overtime compensation under ... the Fair Labor Standards Act."*Id.* at 781.Consequently, the district court dismissed the case because it lacked jurisdiction to entertain the matter. *Id.* at 782.

A review of the cases reveals that it is well settled that, for jurisdictional purposes, there are contractual claims for which an employer may have obligations separate and apart from claims brought under the FLSA. *See, e.g.,Dufrene,* 207 F.3d at 269;*Sheppard,* 302 F.2d at 90;*Timony,* 59 F.Supp. at 779. As both parties acknowledge, Def.'s Mem. at 3; Pl.'s

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3273370 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3273370)

Page 5

Mem. at 2, section 207 of the FLSA mandates that an employer cannot employ an employee for "a workweek longer than forty hours unless such an employee receives compensation for his employment ... at a rate not less than one and one-half times the regular rate at which he is employed."29 U.S.C. § 207(a)(1). As explained in the Code of Federal Regulations, "[t]he Act does not generally require, however, that an employee be paid overtime compensation for hours in excess of eight per day."29 C.F.R. § 778.102. Here, the plaintiff is only seeking compensation for hours worked in excess of eight hours per day, compensation not required by the Act. As the Court in *Timony* stated, "[s]tripped of unnecessary verbiage, the allegations amount to nothing more than ... [the plaintiff's] entitle[ment] ... to the premium called for by the labor agreement."*Timony,* 59 F.Supp. at 781. Thus, the Court finds that although the plaintiff frames her allegations as a claim under the FLSA, it amounts to nothing more than a claim under the collective bargaining agreement between the Hotel & Restaurant Employees Local 25 Union and Centerplate. FN4

*6 The defendant correctly notes that while the FLSA does not relieve an employer of a contractual obligation it has assumed, the plaintiff nonetheless has "*no* cause of action under the FLSA for alleged contractual or other legal violations that do not independently violate the FLSA. *See* Def.'s Reply at 2 (citations omitted). By conceding that the defendant has compensated her for all hours worked in excess of forty per week, Pl.'s Statement at 2, the plaintiff acknowledged that the defendant has paid her all overtime she is entitled to receive pursuant to the FLSA. Thus, even when all inferences are weighed in the light most favorable to the plaintiff, she has no claim under the FLSA because she was compensated for all time worked in excess of forty hours per week, as required by the FLSA. 29 U.S.C. § 207(a)(1); Def.'s Mem. at 1-2. And absent a claim under the FLSA, no federal question exists, and thus this Court does not have subject matter jurisdiction over the dispute in this case.FN5

## IV. Conclusion

Based on the foregoing analysis, the Court holds that the plaintiff does not have a cause of action under the Fair Labor Standards Act, and thus the Court does not have subject matter jurisdiction over this case.FN6Accordingly, it is hereby

ORDERED that the defendant's motion to dismiss pursuant to Rule 12(b)(1) is granted.

SO ORDERED.FN7

> FN7. An Order consistent with this opinion is being issued contemporaneously herewith.

> FN1. The plaintiff originally filed suit against Centerplate/NBSE, Inc. and the Washington Convention Center Authority. Compl. ¶ 3. However, the Washington Convention Center Authority was voluntarily dismissed by the plaintiff as a defendant on August 4, 2004. [D.E. # 4].

> FN2. In Centerplate/NBSE's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss Complaint or Alternatively for Summary Judgment ("Def.'s Reply"), the defendant asserts that because the plaintiff's opposition was not filed within eleven days after she was served with Centerplate's motion, the Court should treat the motion as conceded pursuant to Local Rule 7(b). The Local Rule states that if an opposition memorandum is not filed within eleven days after it was served, "the Court *may* treat the motion as conceded."LCvR 7(b) (emphasis added). The plaintiff's opposition was filed only three days after the eleven day period expired, and because it is not apparent how the defendant has been prejudiced by this untimely filing, the Court will not treat the motion as conceded. *See Twelve John Does v. District of Columbia,* 117 F.3d 571, 577

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3273370 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3273370)

Page 6

(D.C.Cir.1997) (acknowledging district court's authority not to exercise its discretion to treat motion as conceded, but rather to address motion on the merits); *see also Sabbagh v. United Arab Emirates,* No. 03-7027, 2004 WL 288605, at *1 (D.C.Cir. Feb.4, 2004) (affirming district court's decision to treat a motion as conceded after party failed to file any response to motion to dismiss).

FN3. This regulation provides that while the FLSA does not require employers to pay employees overtime compensation for hours worked in excess of eight per day or for work on weekends or holidays, the Act does not relieve an employer of an obligation imposed by a contract or federal or state law that obligates an employer to pay a certain premium rate for work in excess of a daily standard or for work on weekends or holidays. 29 C.F.R. § 778.101.

FN4. The plaintiff alleges that she attempted to file a claim under the Union settlement agreement with a Union representative, but was denied the right to file a claim because of her current management position. Pl.'s Mem. at 2; Ex. 1C (Letter from Barbara Hutchinson to George McDonald dated February 27, 2004) at 1. Whether this denial was appropriate is not an issue this Court has the authority to resolve in this litigation.

FN5. The Court's subject matter jurisdiction must be based on either a federal question pursuant to 28 U.S.C. § 1331 (2000) or diversity of citizenship pursuant to 28 U.S.C. § 1332 (2000). For a court to hear a case based on diversity, the amount in controversy must be at least $75,000. 28 U.S.C. § 1332. The plaintiff in this case has not alleged diversity, nor has she alleged that she is seeking the jurisdictional requisite of $75,000. Without diversity or a

federal question, there is no basis for this Court exercising jurisdiction. *SeeHurt v. Singh,* 118 Fed. Appx. 514 (D.C.Cir.2004) (dismissing case because party did not allege diversity and raised no federal question).

FN6. Additionally, in its motion to dismiss, the defendant asserts that even if the plaintiff does have an actionable claim under the FLSA, much of the plaintiff's relief is time-barred by the statute of limitations. Def.'s Mem. at 4. However, because the Court has already found that it has no jurisdiction to entertain this case, it need not address the statute of limitations question.

D.D.C.,2005.
Fernandez v. Centerplate/NBSE, Inc.
Not Reported in F.Supp.2d, 2005 WL 3273370 (D.D.C.)

END OF DOCUMENT

# Tab 3

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1993 WL 761992 (C.D.Cal.), 147 L.R.R.M. (BNA) 2654
**(Cite as: Not Reported in F.Supp., 1993 WL 761992)**

**H**
Fuentes v. Ralphs Grocery Co.
C.D.Cal.,1993.

United States District Court, C.D. California.
Raul FUENTES and Brian Miller, on behalf of
themselves and all others similarly situated,
Plaintiffs,
v.
RALPHS GROCERY COMPANY, a corporation,
and Teamsters Local 572, Chauffeurs, Sales
Drivers, Warehousemen, and Helpers Union, Affili-
ated with International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of Amer-
ica, an unincorporated association, Defendants.
**No. CV 93-1702 JGD.**

July 28, 1993.

William D. Evans, Mathews & Evans, Pasadena,
CA, for plaintiffs Raul Fuentes, Brian Miller, on
behalf of themselves and all other similarly situ- ated.
Timothy F. Ryan, Marcus A. Torrano, Morrison &
Foerster, Los Angeles, CA, for defendant Ralphs
Grocery Co., a corp.
Robert D. Vogel, Bryan Cave, Los Angeles, CA,
for defendant Local 572 Teamsters Local 572,
Chauffeurs, Sales Drivers, Warehousemen, and
Helpers Union, Affiliated with International Broth-
erhood of Teamster, Chauffeurs, Warehousemen
and Helpers of America, an unincorporated ass'n.

ORDER GRANTING TEAMSTERS LOCAL 572'S
MOTION FOR SUMMARY JUDGMENT AND
GRANTING RALPHS' MOTION TO DISMISS

DAVIES, District Judge.
*1 On July 19, 1993, defendant Teamsters Local
572's Motion for Summary Judgment and defendant
Ralphs Grocery Company's Motion to Dismiss
came before the Court for argument. The Court has
reviewed and considered the parties' papers and the
oral arguments of counsel. Based on this review,

the Court HEREBY GRANTS defendant Teamsters
Local 572's motion for summary judgment, and
GRANTS Ralphs' motion to dismiss.

*FACTS*

On March 24, 1993, plaintiffs Raul Fuentes and
Brian Miller [FN1] filed a class action Complaint (1)
For Breach of Collective Bargaining Agreement;
(2) For Breach of Duty of Fair Representation; and
(3) For Declaratory Relief. The Complaint names as
defendants Ralphs Grocery Co. ("Ralphs") and
Chauffeurs, Sales Drivers, Warehousemen and
Helpers Local 572, International Brotherhood of
Teamsters, AFL-CIO ("Local 572") [FN2].

Plaintiffs are two part-time warehousemen who
worked for Ralphs at its East Los Angeles Produce
Warehouse (the "Produce Warehouse") as of July
1992. Plaintiffs purport to represent a class of ap-
proximately 100 warehouse employees of Ralphs
who worked at the Produce Warehouse until some-
time between July and September of 1992, when
they were transferred to Ralphs' new and expanded
Perishable Service Center in Compton, California.

Until approximately July of 1992, Ralphs employed
approximately 35 full-time and 65 part-time ware-
housemen, including plaintiffs, at its East Los
Angeles Produce Warehouse. Local 630 represen-
ted the Produce Warehouse employees. Each of the
Produce Warehouse employees was covered by a
collective bargaining agreement, negotiated by
Ralphs [FN3] and Local 630, entitled "Retail Produce
Drivers and Warehousemen's Agreement" (the
"Produce Agreement"). *See* Local 572's Ex. 5.

At Ralphs' Produce Warehouse, part-time and full-
time warehouse employees were placed on separate
seniority lists. Seniority for part-time warehouse
employees was based on their date of hire, while
seniority for full-time warehouse employees was
based on the date they achieved full-time status.
Seniority governed any reductions in workforce,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 761992 (C.D.Cal.), 147 L.R.R.M. (BNA) 2654
(Cite as: Not Reported in F.Supp., 1993 WL 761992)

Page 2

layoffs, and rehiring, subject to the other terms of the Produce Agreement. The plaintiffs allege that Article XXIX of the Produce Agreement, entitled "New Locations," protected their seniority rights under certain conditions. The "New Locations" provision of the Produce Agreement provides:

In the event the Employer opens new branches or locations of the type covered by this Agreement, or moves the location of his present operation covered by this Agreement, to a location within the geographical jurisdiction of the Joint Council of Teamsters No. 42 (including Local No. 87), present employees shall have preference for vacancies at such locations in accordance with seniority and qualifications. Such assignments shall be subject to Employer's work force requirements at both the old and new locations. Subject to the above, qualified employees with seniority rights who have been laid off or would be laid off because of such new locations shall have preference for employment before any new employees are hired.

*2 *See* Produce Agreement, Article XXIX, Local 572's Ex. 5.

Prior to the summer of 1992, Ralphs also operated a meat and dairy distribution facility in Compton, California (the "Compton Facility"). The employees at Ralphs' Compton Facility included warehousemen, drivers, and office clerical workers, all of whom were represented by defendant Local 572, and were covered by one of three collective bargaining agreements: the Dairy Plant Agreement, the Drivers Agreement and the Office Agreement, respectively.[FN4] Unlike their counterparts at the Produce Warehouse, all part-time and full-time warehouse employees at the Compton Facility were on an integrated seniority list, based on their date of hire in a bargaining-unit position with Ralphs.

Beginning in 1991 and continuing though July of 1992, Ralphs expanded its Compton Facility, with the intention of merging said Facility and the Produce Warehouse into the single new Perishable Service Center (the "PSC"). Between July of 1992 and

September 30, 1992, the Produce Warehouse was closed. Plaintiffs and other Produce Warehouse employees, both part- and full-time, accepted Ralphs' offer of employment at the expanded PSC.

Since Local 572 already represented all of the bargaining-unit employees who worked at Ralphs' Compton Facility, the unions and Ralphs agreed that Local 572 would represent the warehouse and distribution employees reassigned to the PSC from the closed Produce Warehouse. Thus, after reassignment to the PSC, plaintiffs and the other former Produce Warehouse employees transferred their membership from Local 630 to Local 572.

After transferring to the PSC, plaintiffs and other former Produce Warehouse employees were brought under the coverage of the Dairy Plant Agreement, which contains a "New Locations" provision identical to that set forth in the Produce Agreement. On July 12, 1992, Local 572 and Ralphs negotiated and entered into a side letter agreement, modifying the subsisting Dairy Plant Agreement so that plaintiffs and other former Produce Warehouse employees would be covered by it. *See* Letter from Ralphs' Douglas Rosenow to Local 572's Jack Cox, dated June 9, 1992, Complaint, Ex. D. In the side letter agreement, Local 572 and Ralphs agreed that full-time Produce Warehouse employees transferred to PSC would have seniority based on their date of achieving full-time status, whereas part-time Produce Warehouse employees would have seniority based on their date of transfer to PSC. As a result of the side letter agreement, the reassigned Produce Warehouse employees were given different seniority treatment than the Compton Facility employees, who continued to work at PSC and who were credited with seniority based on their date of hire in a bargaining-unit position with Ralphs.

Upon learning that Ralphs would not credit them with seniority based on their dates of hire, while the Compton Facility employees were so credited, plaintiffs and other reassigned Produce Warehouse employees protested the terms of the side letter

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 761992 (C.D.Cal.), 147 L.R.R.M. (BNA) 2654
**(Cite as: Not Reported in F.Supp., 1993 WL 761992)**

Page 3

agreement to Ralphs, Local 630, and Local 572. Plaintiffs attempted to grieve the dispute under their collective bargaining agreement, and Local 572 rejected the grievance.

**\*3** Thereafter, in response to the continued protests of plaintiffs and other former Produce Warehouse employees, Local 572 negotiated with Ralphs in an effort to arrive at a revised agreement whereby the seniority rights of the former Produce Warehouse employees would be "dovetailed," or merged, with the seniority of Compton facility employees.

Local 572's efforts to negotiate a revised agreement were unsuccessful. On or about December 16, 1992, Local 572 advised plaintiffs that it would no longer attempt to renegotiate the July 12, 1992 side letter agreement with Ralphs, but would abide by the terms of said agreement.

Plaintiffs allege that Local 572 breached the duty of fair representation by (1) negotiating and entering into the side letter agreement, under which the plaintiffs' seniority was calculated differently than the seniority of former Compton Facility employees; (2) its subsequent ineffectual efforts to reach a revised agreement under which plaintiffs' seniority rights would be dovetailed with the seniority rights of the Compton Facility employees; and (3) rejecting plaintiffs' grievance concerning their seniority rights. Essentially, plaintiffs argue that the July 12, 1992 side letter agreement violated the "New Locations" provision contained in both the Dairy Plant Agreement and the Produce Agreement, and failed to dovetail the seniority of the part-time and full-time Produce Warehouse employees with the seniority of the part-time and full-time Compton Facility warehouse employees.

Plaintiffs further allege that Ralphs breached its collective bargaining agreement or agreements with Local 630 and Local 572 by (1) refusing to credit plaintiffs' seniority based on their dates of hire; and (2) refusing to dovetail the Produce Warehouse employees' seniority rights with those of the Compton Facility warehouse employees after the two facilit-

ies were merged to form the PSC.

## DISCUSSION

I. *Local 572's Motion for Summary Judgment* [FN5]

Local 572 seeks summary judgment on plaintiffs' claim for breach of the duty of fair representation, arguing that there is no triable issue as to whether Local 572 acted reasonably in its negotiations with Ralphs concerning plaintiffs' seniority rights.

A. *The Standard*

Upon a showing that there is no genuine issue of material fact as to particular claims, the Court may grant summary judgment in the plaintiff's favor upon all or any part thereof. *See* W. Schwarzer. A.W. Tashima, J. Wagstaffe, Federal Civil Procedure Before Trial, § 14:33 (1993) (citing Fed.R.Civ.Pro. Rules 56(a), (b)). The standards and procedures are the same as for summary judgment of a claim. *Id.*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. Rule 56(c). Whether a fact is material is determined by looking to the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Facts are deemed "material" if a dispute over them "might affect the outcome of the suit under the governing law...." *Id.*

**\*4** The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Id.* at 256. Rule 56(e) provides that "[w]hen a motion for summary judgment is made and supported as provided for in this rule, an adverse party may not rest upon the mere allegations or denials of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 761992 (C.D.Cal.), 147 L.R.R.M. (BNA) 2654
(Cite as: Not Reported in F.Supp., 1993 WL 761992)

adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. Rule 56(e).

As the Supreme Court explained in *Matsushita Electrical Industry Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986):

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

477 U.S. at 586-87. A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish an essential element to that party's case, and on which that party would bear the burden of proof at trial. *Celotex Corporation v. Catrett,* 477 U.S. 317, 322-23 (1986). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255 (citing *Adickes v. S.H. Kress and Company,* 398 U.S. 144 (1970)).

However, an alleged "genuine issue" will not defeat summary judgment where the factual context makes the non-movant's allegations implausible. *See California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 848 U.S. 1006 (1988). Consequently, where the factual context makes the non-movant's claim implausible, the non-movant "must come forward with more persuasive evidence to support their claim than would otherwise be necessary" to show that there is a genuine issue for trial. *Id.*

B. *Analysis*

The plaintiffs allege that Local 572 breached the duty of fair representation by negotiating the side letter agreement, which (1) violated the "New Locations" provision of their contract and had an adverse impact on their seniority; and (2) failed to provide that plaintiffs' seniority rights would be "dovetailed" or merged with those of the Compton Facility warehouse employees.

Just as other fiduciaries owe their beneficiaries a duty of care and a duty of loyalty, "a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Air Line Pilots Ass'n Intern. v. O'Neill,* 499 U.S. 65, 111 S.Ct. 1127, 1134, 113 L.Ed.2d 51 (1991) (citations omitted). The doctrine of fair representation exists to ensure that unions serve the interests of all members equally, without hostility or discrimination toward some. *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967).

*5 A union breaches its duty of fair representation when its conduct toward a member of the collective bargaining agreement is "arbitrary, discriminatory or in bad faith." *Vaca,* 386 U.S. at 177, 87 S.Ct. at 910. This standard applies to a union's negotiation activities, in addition to its contract administration and enforcement efforts. *O'Neill,* 111 S.Ct. at 1135.

The Court may not substitute its own view of a "proper bargain" for that reached by the union. *Id.,* at 1135. "Any substantive examination of a union's performance ... must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Id.* Thus, the final product of a union's negotiation process constitutes evidence of a breach of the duty of fair representation only if "it can be fairly characterized as so far outside of a 'wide range of reasonableness' ... that it is wholly 'irrational' or 'arbitrary.' " *Id.* at 1136 (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953)).

1. *The "New Locations" Provision*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1993 WL 761992 (C.D.Cal.), 147 L.R.R.M. (BNA) 2654
(Cite as: Not Reported in F.Supp., 1993 WL 761992)

Plaintiffs contend that the product of Local 572's negotiations with Ralphs, i.e., the side letter agreement, is irrational or arbitrary because it violates the "New Locations" provisions of the Produce Agreement and the Dairy Plant Agreement. Plaintiffs believe that the "New Locations" provision of said contracts requires Ralphs to dovetail their Produce Warehouse seniority with the seniority of the Compton Facility warehouse employees.

The "New Locations" provision, as set forth in both the Produce Agreement and the Dairy Plant Agreement provides:

In the event the Employer opens new branches or locations of the type covered by this Agreement, or moves the location of his present operation covered by this Agreement, to a location within the geographical jurisdiction of the Joint Council of Teamsters No. 42 (including Local No. 87), present employees shall have preference for vacancies at such locations in accordance with seniority and qualifications. Such assignments shall be subject to Employer's work force requirements at both the old and new locations. Subject to the above, qualified employees with seniority rights who have been laid off or would be laid off because of such new locations shall have preference for employment before any new employees are hired.

*See* Produce Agreement, Article XXIX, Local 572's Ex. 5.

During its negotiations with Locals 572 and 630 regarding the merger of the Produce Warehouse and the Compton Facility, Ralphs took the position that the "New Locations" language did not apply to displaced Produce Warehouse employees. *See* Gualtiere Decl., para. 42. Ralphs argued that it was not moving the Produce Warehouse operations to a new location, but was merging them with the Compton Facility operations to form the PSC. *Id.* As such, the displaced Produce Warehouse employees would no longer be performing the same work after their reassignment to the PSC, and the "New Locations" provision was inapplicable. *Id.,* para. 43. Thus,

Ralphs argued, the former Produce Warehouse employees had no contractual right to follow work to the new PSC. *Id.*

*6 Locals 572 and 630 disagreed with Ralphs' interpretation and application of the "New Locations" provision. *Id.; see also* Letter from Local 630 to Ralphs, dated June 16, 1992, Local 572's Ex. 17. Local 572 took the position that, under the "New Locations" language, Ralphs was contractually obligated to afford displaced Produce Warehouse employees preference for any vacant bargaining-unit positions at the PSC which were attributable to the merger of the Produce Warehouse and the Compton Facility. *Id.,* para. 44. In other words, Local 572 argued that plaintiffs and other former Produce Warehouse employees were contractually entitled to bargaining-unit vacancies at the PSC before Ralphs attempted to fill such vacancies by hiring employees off the street.

While Ralphs and Local 572 disagreed as to the proper application of the "New Locations" provision, both agreed that said provision did not dictate the manner in which plaintiffs' Produce Warehouse seniority would apply, if at all, at the PSC. *Id.,* para. 45. This interpretation, shared by Ralphs and Local 572, is consistent with the explicit contract language. *See* Produce Agreement, Article XXIX, Local 572's Ex. 5. Nothing in the "New Locations" language provides that, when Ralphs fills job vacancies at a new location, the seniority that displaced employees possessed at their prior location must be merged with the seniority of the employees at the new location. On its face, the side letter agreement negotiated by Local 572 does not appear to violate the "New Locations" provision.

The plaintiffs obviously disagree with Local 572's interpretation of the "New Locations" language. However, there is simply no evidence that Local 572's interpretation, or the negotiated side letter agreement which reflects that interpretation, are "wholly irrational or arbitrary." *See O'Neill,* 111 S.Ct. at 1136.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 761992 (C.D.Cal.), 147 L.R.R.M. (BNA) 2654
(Cite as: Not Reported in F.Supp., 1993 WL 761992)

Page 6

2. *Local 572's Failure to Negotiate an Agreement
Under Which Plaintiffs' Seniority Would Be Dove-
tailed*

The plaintiffs allege that, whether or not the side
letter agreement violates the "New Locations" pro-
vision, Local 572 breached its duty of fair repres-
entation by negotiating an agreement whereby
plaintiffs' seniority rights would not be dovetailed
with those of the Compton Facility warehouse em-
ployees. However, Local 572 has submitted evid-
ence that its negotiation of the side letter agree-
ment, and its subsequent efforts to respond to
plaintiffs' protests, were well within the range of
reasonableness.

During the negotiations, Ralphs disagreed with
Local 572's position that, under the "New Loca-
tions" provision, displaced Produce Warehouse em-
ployees were entitled to preference for vacant bar-
gaining-unit positions at PSC. *See* Gualtiere Decl.,
para. 46. Ralphs threatened to terminate all dis-
placed Produce Warehouse employees unless it
could reach agreement with Local 572 concerning
the terms of the merger between the Produce Ware-
house and the Compton Facility. *Id.* When Ralphs
finally agreed to honor the "New Locations" provi-
sion by allowing plaintiffs and other Produce Ware-
house employees to follow the work to the PSC,
Local 572 entered into the side letter agreement.

*7 A few weeks earlier, on or about June 29, 1992,
plaintiff Raul Fuentes and three other Produce
Warehouse employees had filed a grievance with
Local 630, alleging that Local 572 had failed to
fairly represent them by refusing to insist that their
seniority be dovetailed with the seniority of the
Compton Facility employees. Notwithstanding this
grievance, Local 572 entered the side letter agree-
ment on July 12, 1992, thus avoiding the threatened
termination of plaintiffs and other Produce Ware-
house employees.

Shortly after plaintiffs and other Produce Ware-
house employees relocated to PSC and transferred
their membership to Local 572, Local 572 met with

a group of part-time Produce Warehouse employ-
ees, including plaintiffs, to discuss their complaints
about the seniority credit issue. Local 572 ex-
plained to the part-time Produce Warehouse em-
ployees why their seniority was not merged with
the seniority of the full-time Produce Warehouse
employees and the part-time and full-time Compton
Facility warehouse employees. During the meeting,
Local 572 agreed to establish a committee of em-
ployees to resolve concerns about the seniority is-
sue. The committee was formed and, with the ap-
proval of Local 572, it proposed to Ralphs that two
separate seniority lists be used to cover all ware-
house employees at PSC: a part-time list and a full-
time list, both with seniority based on the employ-
ee's date of hire in a bargaining-unit capacity.
Ralphs rejected the proposal. *See* Local 572's Exs.
25-27

On December 23, 1992, plaintiff Fuentes filed a
written grievance with Local 572, again complain-
ing about the manner in which the seniority of
former part-time Produce Warehouse employees
was credited at the PSC. *See* Local 572's Ex. 28. On
December 28, 1992, Local 572 informed Fuentes in
writing that his grievance lacked merit, because he
could not substantiate a violation of either the Dairy
Plant Agreement or the side letter agreement. *See*
Local 572's Ex. 29.

Based on these facts and events, Local 572 appears
to have acted within "a wide range of reasonable-
ness" by accepting the terms of the side letter
agreement, after Ralphs had agreed to transfer dis-
placed Produce Warehouse employees to fill vacan-
cies at the PSC. Local 572 offers three reasonable
explanations for its failure to insist that the senior-
ity of displaced Produce Warehouse employees be
credited in the same manner as the seniority of
Compton Facility employees. First, Local 572 did
not construe the "New Locations" provision to re-
quire such an arrangement. As discussed earlier,
this reading of the "New Language" provision is
consistent with the explicit contractual language,
and is not irrational or arbitrary.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Second, Local 572 believed that Ralphs might terminate the displaced Produce Warehouse employees if a satisfactory agreement was not reached. Rather than dispute the manner in which seniority would be credited, Local 572 opted to avoid a risk that the Produce Warehouse employees would lose their jobs altogether. As a result of Local 572's negotiation of the side letter agreement, all Produce Warehouse employees were either transferred or offered the right to transfer to the PSC. No clerical employee, driver or warehouseman formerly employed at the Produce Warehouse was terminated, laid off, or displaced.

*8 Third, Local 572 represented the Compton Facility employees who continued to work at the PSC, as well as the former Produce Warehouse employees. Since 1987, the Compton Facility warehouse employees, both part-time and full-time, had been on an integrated seniority list. Local 572 and Ralphs believed that unrest and confusion would result among the Compton Facility warehouse employees if their seniority was merged with the seniority of the Produce Warehouse employees. Local 572 had an obligation to fairly represent the Compton Facility employees' interests, as well as the interests of plaintiffs, in negotiating the side letter agreement. Local 572 was not required, and could not have been expected, to completely satisfy all of its members. *See Ford Motor Co.,* 345 U.S. at 338.

Finally, after entering into the side letter agreement and ensuring continued employment opportunities for the former Produce Warehouse employees, Local 572 addressed the employees' concerns regarding seniority. Local 572 explained its negotiation process, formed a committee of employees to address the seniority issue, and approved a committee proposal to be submitted to Ralphs. In short, Local 572 acted reasonably and in apparent good faith in handling its members' complaints.

In their opposition, plaintiffs have failed to come forward with any affirmative evidence that Local 572 acted arbitrarily, irrationally, or in bad faith while conducting negotiations with Ralphs. Rather,

plaintiffs cite several cases where courts have found that unions breached the duty of fair representation. All of the cited cases are inapposite.

In *Ackley v. Local Union 377,* 910 F.2d 1295 (6th Cir.1990), the union breached the duty of fair representation by failing to dovetail the seniority of employees who were transferred to a new location, notwithstanding contractual language which explicitly required such dovetailing. In the present case, though, the "New Locations" provision in the plaintiffs' contract neither expressly states nor implicitly provides that plaintiffs' seniority would be dovetailed in the event the Produce Warehouse closed.

In *Truck Drivers & Helpers Local Union 568 v. N.L.R.B.,* 379 F.2d 137, 142 (D.C.Cir.1967), the union breached the duty of fair representation where it refused to dovetail the plaintiffs' seniority lists based on impermissible political motives. However, in this case, there is no evidence that Local 572 acted with impermissible motives, political or otherwise.

In *Barton Brands, Ltd. v. N.L.R.B.,* 529 F.2d 793, 798-99 (7th Cir.1976), two groups of employees voted to dovetail their seniority, and their contract was amended to so provide. When that contract expired and a new contract was negotiated, the union proposed that the seniority of the two previously dovetailed groups now be endtailed. In so doing, the union acted for political reasons, in an effort to satisfy a majority of its members. The union's insistence on endtailing, and abandonment of contractual benefits already enjoyed by its members, was without "objective justification" and breached the duty of fair representation. In contrast, there is no evidence that Local 572's negotiations were politically motivated. Rather, Local 572 has offered an objective justification for its conduct.

*9 The plaintiffs' citation of cases in which unions have breached the duty of fair representation, without some showing that said cases are analogous to the instant case, does not create a triable issue of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fact. The plaintiffs have simply failed to offer any evidence that Local 572 acted irrationally or arbitrarily, whereas Local 572 has come forward with persuasive evidence to the contrary. Thus, even when all the evidence is construed in favor of the plaintiffs, it is insufficient to raise a genuine issue as to the Local 572's breach of the duty of fair representation.

### 3. *Plaintiffs' Request for Continuance Pursuant to Rule 56(f)*

In their opposition papers, plaintiffs request that the present summary judgment motion be continued pursuant to Fed.R.Civ.Pro. Rule 56(f), if the Court is otherwise inclined to grant it.

A summary judgment motion may be premature where the non-movant, for reasons set forth in an affidavit, needs additional time to discover facts essential to justify its opposition. *See*Fed.R.Civ.Pro. Rule 56(f). Under such circumstances, the Court may refuse the application for summary judgment or order a continuance to permit further discovery. *Id.* The Court's denial of a request for continuance is reviewed for abuse of discretion. *See Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1416-17 (9th Cir.1987).

However, an application for a continuance pursuant to Rule 56(f) may be properly denied where the additional evidence sought is the object of pure speculation. *See Terrell v. Brewer,* 935 F.2d 1015, 1018 (9th Cir.1991). The party opposing summary judgment bears the burden of showing what facts he hopes to discover, and that the evidence sought exists. *Id.; see also Keebler Co. v. Murray Bakery Products,* 866 F.2d 1386, 1388-89 (Fed.Cir.1989) (non-movant's claim that it has no factual basis for opposing summary judgment, but might find something if proceedings are stayed, is insufficient ground for Rule 56(f) continuance).

Here, the plaintiffs have submitted the declaration of their attorney, William D. Evans, outlining the subjects on which additional discovery will be conducted. *See* Evans Decl., para. 3. However, none of the designated subject areas appear likely to reveal that Local 572's contract negotiations were arbitrary or irrational. While plaintiffs undoubtedly hope to discover some evidence that Local 572 acted irrationally or arbitrarily, they have not sustained the burden of showing that such evidence actually exists. The fact that plaintiffs might find some evidence if given enough time does not warrant a continuance under Rule 56(f).

In sum, Local 572 is entitled to summary judgment on the plaintiffs' claim for breach of the duty of fair representation.

### II. *Ralphs' Motion to Dismiss*

Defendant Ralph's motion to dismiss pursuant to Rule 12(b)(6) is brought as a companion motion to, and is based in part upon, Local 572's motion for summary judgment.[FN6] Ralphs argues that plaintiffs' claims for breach of collective bargaining agreement and declaratory relief, both of which name Ralphs as a defendant, are based on collective bargaining agreements and are preempted by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(c). Thus, Ralphs contends, plaintiffs must establish that the Union breached its duty of fair representation before they can state a Section 301 claim against Ralphs.

### A. *The Standard*

**\*10** Fed.R.Civ.P. Rule 12(b)(6) provides for dismissal where the complaint fails to state a claim upon which relief can be granted. In reviewing a Rule 12(b)(6) motion, the court must accept as true all material allegations in the complaint, as well as reasonable inferences that can be drawn therefrom, and must construe those facts and inferences in a light most favorable to the non-moving party. *See NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). To dismiss with prejudice it must appear to a certainty that the plaintiff would not be

entitled to relief under any set of facts that could be proved. *See Halet v. Wend Investment Co.,* 672 F.2d 1305, 1309 (9th Cir.1982).

### B. *Analysis*

The threshold issue is whether plaintiffs' claims against Ralphs are properly construed as Section 301 claims.

At all times relevant to this lawsuit, the plaintiffs were covered by the terms of a collective bargaining agreement between Ralph's and Local 572. A suit against an employer for breach of a collective bargaining agreement is governed exclusively by federal law under Section 301(a). *See* 29 U.S.C. § 185(a); *Young v. Anthony's Fish Grottos, Inc.,* 830 F.2d 993, 997 (9th Cir.1987). In fact, the Ninth Circuit has held that:

[t]he preemptive force of section 301 is so great as to displace entirely any state claim based on a collective bargaining agreement ... and any state claim whose outcome depends on analysis of the terms of the agreement.

*Young,* 830 F.2d at 997 (citations omitted) (citing *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 23 (1983); *IBEW v. Hechler,* 107 S.Ct. 2161, 2166 (1987); *Stallcop v. Kaiser Foundation Hosps.,* 820 F.2d 1044, 1048 (9th Cir.1987)).

Thus, plaintiffs breach of contract and declaratory relief claims are governed by Section 301 of the LMRA. Said claims must be legally sufficient under Section 301 to withstand the present Rule 12(b)(6) motion.

Where, as here, the collective bargaining agreement confers upon employers and unions the power to establish exclusive grievance procedures, *see* Dairy Plant Agreement, Art. XVI, the employee may not proceed directly against the employer for violation of the collective bargaining agreement without establishing that the union has breached its duty of

fair representation. *See Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 566-67 (1976); *Vaca v. Sipes,* 386 U.S. at 185; *Carter v. Smith Food King,* 765 F.2d 916, 919 n. 4 (9th Cir.1985). Therefore, in order to assert a viable Section 301 claim for breach of collective bargaining agreement against Ralphs, plaintiffs must raise a triable issue as to Local 572's breach of the duty of fair representation. As discussed above, the plaintiffs have not sustained that burden, and their claims against Ralphs are subject to dismissal under Fed.R.Civ.Pro. Rule 12(b)(6).

### CONCLUSION

For all of these reasons, the Court HEREBY GRANTS defendant Teamsters Local 572's motion for summary judgment and GRANTS defendant Ralphs Grocery Company's motion to dismiss.

**\*11** IT IS SO ORDERED.

> FN1. Plaintiffs seek to bring this action as a class action on behalf of themselves and all other part- and full-time produce warehousemen similarly situated. However, no class has yet been certified.

> FN2. Local 572 is erroneously sued herein as "Teamsters Local 572, Chauffeurs, Sales Drivers, Warehousemen, and Helpers Union, Affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, an unincorporated association."

> FN3. Defendant Ralphs is a member of and negotiates through the Food Employers' Council, Inc. (the "FEC"). The FEC is a multi-employer association engaged in collective bargaining on behalf of its employer-members, retail grocery companies in Southern California. The FEC, on behalf of Ralphs, has negotiated collective bargaining agreements with various locals of the International Brotherhood of Teamsters,

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 761992 (C.D.Cal.), 147 L.R.R.M. (BNA) 2654
**(Cite as: Not Reported in F.Supp., 1993 WL 761992)**

Page 10

including Local 630 and defendant Local 572.

FN4. The Office Agreement, the Dairy Plant Agreement and the Drivers Agreement which covered the Compton Facility employees were negotiated by Local 572 and the FEC on behalf of Ralphs.

FN5. Ralphs has filed a notice of joinder in Local 572's motion for summary judgment.

FN6. Ralphs has joined in Local 572's motion for summary judgment, and relies on the evidence and legal arguments presented there in support of the separate motion to dismiss.

C.D.Cal.,1993.
Fuentes v. Ralphs Grocery Co.
Not Reported in F.Supp., 1993 WL 761992 (C.D.Cal.), 147 L.R.R.M. (BNA) 2654

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 4

Westlaw.

Slip Copy
Slip Copy, 2008 WL 171003 (E.D.Cal.)
(Cite as: Slip Copy, 2008 WL 171003)

Page 1

Mendes v. W.M. Lyles Co.
E.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court,E.D. California.
Frank MENDES, Plaintiff,
v.
W.M. LYLES CO., a California corporation, and
Does 1 through 100, inclusive, Defendant.
**No. CIV F 07-1265 AWI GSA.**

Jan. 18, 2008.

Kenneth M. Fitzgerald, Law Offices of Kenneth M.
Fitzgerald, Visalia, CA, for Plaintiff.
Spencer H. Hipp, Littler Mendelson, P.C., Fresno,
CA, for Defendant.

### ORDER ON DEFENDANT'S MOTION TO DISMISS

ANTHONY W. ISHII, District Judge.
*1 This is a wage dispute between Plaintiff Frank
Mendes ("Mendes") and his former employer, De-
fendant W.M. Lyles Co. ("Lyles"). Mendes filed a
complaint in the Tulare County Superior Court.
Lyles removed to this Court on the basis of a feder-
al question and filed a motion to dismiss. In re-
sponse, Mendes filed a First Amended Complaint
("FAC") alleging four state law claims and a breach
of a collective bargaining agreement through the
Labor and Management Relations Act ("LMRA").
Lyles now moves to dismiss the FAC under Rule
12(b)(6). For the reasons that follow, Lyles's mo-
tion will be granted in part and denied in part.

### BACKGROUND

From the FAC, Mendes was employed by Lyles
from September 1988 to December 19, 2006. At all
pertinent times, Mendes was a member in good
standing of the Operating Engineer's Union and em-
ployed by Lyles under the terms of the Operating
Engineers' Union Collective Bargaining Agreement

("the OEU").[FN1] Mendes was at all times duly
qualified and performed his duties in a satisfactory
manner.

> FN1. There were several collective bar-
> gaining agreements in force during
> Mendes's employment: (1) an OEU effect-
> ive from 2002 through 2006; (2) an OEU
> effective from 2006 through 2010; (3) a
> Public Utility Agreement effective through
> 2005; and (4) a Public Utility Agreement
> effective from July 1, 2006 through June
> 30, 2010.

On December 28, 2006, dispatchers Jesse Casarez
and George Tomine approached Mendes to inquire
about Mendes's pay structure. Mendes indicated to
Casarez and Tomine that he was paid from the time
he left the yard to go to the jobsite. Casarez told
Mendes that Mendes would no longer be paid from
the time he left the yard. Instead Mendes would be
paid from the time he arrived at the jobsite in Lyle's
vehicle, which Mendes would drive from the yard.
Mendes told Casarez that this was not right and that
his pay by law and by the OEU had to begin when
he left the yard to proceed to the jobsite in Lyles's
vehicle. Mendes also reported the allegedly illegal
conduct of failing to pay for travel from the yard to
the jobsite to Casarez.

On December 29, 2006, one day after reporting the
allegedly illegal conduct to Casarez, Lyles suddenly
and without notice terminated Mendes stating that
his services were no longer required because it was
slow and his position was no longer needed. On in-
formation and belief, approximately two days later,
Lyles hired another person to do the exact same job
as Mendes, but the new hire was not paid to drive
Lyles's vehicle from the yard to the jobsite.

From the pay period of March 23, 2000, through
the pay period ending September 29, 2005, Lyles
paid Mendes what it referred to as a "utility rate."
Lyles told Mendes that it had an agreement with the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 171003 (E.D.Cal.)
**(Cite as: Slip Copy, 2008 WL 171003)**

Page 2

Operating Engineers Union whereby Lyles could pay this "utility rate" to Mendes. On October 6, 2005, Lyles suddenly and without notice raised Mendes's pay by approximately $9.97 per hour. This was the first time that Mendes began to suspect that Lyles had underpaid him illegally and in violation of the OEU.

Lyles knew of its contractual and statutory duties to pay Mendes wages according to the OEU and California law. However, Lyles intentionally and improperly failed to pay the wages due and owing to Mendes. Lyles knowingly and intentionally established and carried out a policy that was in violation of California Labor Code §§ 201, 222, and 227 in that Mendes was not paid the wage agreed upon in the OEU, thereby depriving Mendes of wages and further payments into Mendes's retirement fund. Lyles failed to pay the agreed wage by paying approximately $9.97 less per hour to Mendes.

**\*2** On or about late January 2007, Mendes told his union representative about the unlawful conduct of Lyles, to which the representative responded that Mendes was required to file a grievance within 20 days of termination. However, Mendes did not find out that he had been replaced until late January 2007. Mendes had believed that work was slow. When Mendes discovered that he had been replaced, he immediately contacted the representative, who then told Mendes that it was too late to file a grievance.

Mendes filed this lawsuit and filed the FAC in September 2007. The FAC alleges: (1) wrongful termination in violation of public policy based on the public policy expressed by California Labor Code § 222; (2) Non-payment of wages in violation of California Labor Code §§ 201, 222, and 227; (3) waiting time penalties under California Labor Code § 203; (4) breach of the OEU; and (5) breach of the implied covenant of good faith and fair dealing. Lyles moves to dismiss all state law claims on the grounds that the claims are preempted by the LMRA.

### Rule 12(b) (6) Framework

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted."Fed.R.Civ.P. 12(b)(6). This rule provides for dismissal of a claim if, as a matter of law, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Parks Sch. of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995); *see Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Newman v. Sathyavaglswaran,* 287 F.3d 786, 788 (9th Cir.2002); *Vignolo v. Miller,* 120 F.3d 1075, 1077 (9th Cir.1999). The Court must also assume that general allegations embrace the necessary, specific facts to support the claim. *Smith v. Pacific Prop. and Dev. Corp.,* 358 F.3d 1097, 1106 (9th Cir.2004); *Peloza v. Capistrano Unified Sch. Dist.,* 37 F.3d 517, 521 (9th Cir.1994). But, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."*Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001); *see also Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1139 (9th Cir.2003); *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). Courts will not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations."*Warren,* 328 F.3d at 1139;*Western Mining Council,* 643 F.2d at 624. Furthermore, Courts will not assume that plaintiffs "can prove facts which [they have] not alleged, or that the defendants have violated ... laws in ways that have not been alleged."*Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 171003 (E.D.Cal.)
**(Cite as: Slip Copy, 2008 WL 171003)**

**\*3** In deciding whether to dismiss a claim under Rule 12(b)(6), the Court is generally limited to reviewing only the complaint, but may review documents upon which a plaintiff's claim relies and about which there are no objections to authenticity. *Parrino v. FHP, Inc.,* 146 F.3d 699, 705-06 (9th Cir.1998). A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001); *Balistreri v. Pacifica Police Dep't.,* 901 F.2d 696, 699 (9th Cir.1988). If a Rule 12(b)(6) motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."*Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (en banc) (quoting *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995)). In other words, leave to amend need not be granted when amendment would be futile. *Gompper v. VISX, Inc.,* 298 F.3d 893, 898 (9th Cir.2002).

### DEFENDANT'S MOTION

#### Defendant's Argument

Lyles argues that all of the state law causes of action are preempted by the § 301 of the LMRA because they all require the interpretation of the applicable collective bargaining agreement. The preemptive power of the LMRA reaches even state tort law causes of action if the duty violated is created by the bargaining agreement and would not exist independent of the bargaining agreement. The first cause of action does not allege that Mendes was paid improperly as a result of the alleged December 28 conversation. Resolution of the claim would required the interpretation of seven provisions of the current Private Utility Agreement (hereinafter "PUA") (Teixeira Declaration Exhibit E) and eight provisions of the 2006-2010 OEU (Teixeira Declaration Exhibit D).

With respect to the second cause of action, that claim is based on compensation that was allegedly due under the OEU. Resolution of that claim would require interpretation of a prior PUA, numerous provisions of the current PUA, and five provisions of the 2002-2006 OEU (Teixeira Declaration Exhibit C).

With respect to the third cause of action, that claim is based on the alleged failure to pay wages that should have been paid under the collective bargaining agreements. The same questions and sections of the agreements that will require interpretation in order to resolve the first and second causes of action will also require interpretation to resolve the third cause of action. The same is also true of the fifth cause of action.

Each of the causes of action will require the Court to determine which bargaining agreement applies. The causes of action will also require a determination of the type of work performed, Mendes's classification within the agreements, whether the special private utility rate applied, whether a travel pay agreement applies, and whether Lyles violated any of the contractual agreements.

**\*4** Also, the second, third, and fifth causes of action are barred because Mendes did not follow the grievance provisions of the OEU. There were two bargaining agreements in place during the relevant time periods and each had dispute resolution procedures. However, Mendes never filed a grievance regarding the "utility rate" from March 2000 through September 2005. Even though he became suspicious of the rate in October 2005, he did nothing. Since he did not exhaust the contractual grievance procedures, dismissal of these causes of action is necessary.

#### Plaintiff's Opposition

Mendes concedes that the Fifth Cause of Action for breach of the covenant of good faith and fair dealing is preempted. However, Mendes argues that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

First, Second, and Third causes of action are not preempted because they are all independent state rights that require at most mere reference to the collective bargaining agreement. However, in the event that the Court disagrees, leave to amend should granted.

The First Cause of Action is for wrongful termination. The FAC alleges that he was terminated in retaliation for insisting that he be payed his agreed upon wages. No collective bargaining agreement need be interpreted or construed because the factual determination involves Lyle's motivation in the termination.

The Second Cause of Action is non-payment of wages under California law. The right to be paid the wages owed to him is a state law right that is independent of the collective bargaining agreement. Also, no interpretation of the collective bargaining agreement is needed because all that is necessary to resolve this claim is reference to the OEU to determine the correct wage rate.

The Third Cause of Action is for waiting time penalties under California Labor Code § 203. Again, waiting time penalties is a right that exists apart from the collective bargaining agreement and the collective bargaining agreement would only have to be referenced in order to determine the penalty.

With respect to exhaustion of grievance procedures, there is no exhaustion requirement where rights independent of the collective bargaining agreement are sued upon. Since the second and third causes of action are independent, no exhaustion was necessary. Further, even if an exhaustion requirement applied, the collective bargaining agreement provides that these particular claims are not subject to arbitration. Also, Mendes attempted to file a grievance with the Union but was told that it was too late.

### Legal Standards

Under § 301 of the LMRA, "Suits for violation of contracts between an employer and a labor organiz-

ation representing employees in an industry affecting commerce ... or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties".... 29 U.S.C. § 185(a); *Burnside v. Kiewit Pac. Corp.,* 491 F.3d 1053, 1059 (9th Cir.2007)."Although the text of § 301 contains only a jurisdictional grant, the Supreme Court has interpreted it to compel the complete preemption of state law claims brought to enforce collective bargaining agreements ... [as well as] cases the resolution of which 'is substantially dependent upon analysis of the terms of [a collective bargaining agreement].' *"Valles v. Ivy Hill Corp.,* 410 F.3d 1071, 1076 (9th Cir.2005) (citing *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *Avco Corp. v. Aero Lodge No. 735,* 390 U.S. 557, 560, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968))."The Supreme Court has held in a variety of contexts that § 301 acts to preempt state law claims that substantially depend on the CBA, that are premised on negotiable or waivable state law duties the content of which has been covered by the CBA, or that seek to enforce the terms of the CBA, for example, breach of contract claims."*Humble v. Boeing Co.,* 305 F.3d 1004, 1007 (9th Cir.2002); *see also Jimeno v. Mobil Oil Corp.,* 66 F.3d 1514, 1522-23 (9th Cir.1995). Accordingly, a state law claim will be preempted by § 301:(1) "on the basis of the subject matter of the law in question, as where the claims [are] founded directly on rights created by collective-bargaining agreements;" and (2) "where the right is created by state law and not by the collective-bargaining agreement, a claim based upon that right is preempted if [the application of state law] requires the interpretation of a collective-bargaining agreement."*Gulden v. Crown Zellerbach Corp.,* 890 F.2d 195, 198 (9th Cir.1989). In other words, "state law causes of action are preempted if they are either based upon the collective bargaining agreement or dependent upon an interpretation of the agreement."*Ramirez v. Fox Broadcasting, Inc.,* 998 F.2d 743, 748 (9th Cir.1992); *see Burnside,* 491 F.3d at 1059-60 (noting a claim is preempted based on its "legal character" or substantial depend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ence on an analysis of an agreement).

**\*5** "Despite the breadth of § 301 preemption, not every claim which requires a court to refer to the language of a labor-management agreement is necessarily preempted."*Balcorta v. Twentieth Century-Fox Film Corp.,* 208 F.3d 1102, 1108 (9th Cir.2000)."A claim brought in state court on the basis of a state-law right that is 'independent of rights under the collective-bargaining agreement,' will not be preempted, even if 'a grievance arising from 'precisely the same set of facts' could be pursued.... [W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished."*Valles,* 410 F.3d at 1076. "[I]n the context of § 301 complete preemption, the term 'interpret' is defined narrowly-it means something more than 'consider,' 'refer to,' or 'apply.' *Balcorta,* 208 F.3d at 1108. "[T]he need to interpret the [collective bargaining agreement] must inhere in the nature of the plaintiff's claim."*Valles,* 410 F.3d at 1076. Further, as the Supreme Court has explained:

A collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state law suit is entitled. Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state law claim, not otherwise preempted, would stand. Thus, as a general proposition, a state law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and a separate state law analysis that does not turn on the agreement. In such a case, federal law would govern the interpretation of the agreement, but the separate state law analysis would not be thereby preempted.

*Lingle v. Norge Division of Magic Chef,* 486 U.S. 399, 413 n. 12, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988); *Gulden,* 890 F.2d at 199 n. 5. Accordingly,

LMRA § 301 "should be applied only to state laws purporting to determine questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, and to tort suits which allege breaches of duties assumed in collective bargaining agreements."*Associated Builders & Contrs. v. Local 302 IBEW,* 109 F.3d 1353, 1357 (9th Cir.1997).

*Discussion*[FN2]

> FN2. All references to the "Labor Code" are to the California Labor Code.

*1. First Cause of Action-Wrongful Discharge In Violation Of Public Policy*

"For a policy to support a wrongful discharge claim, [the policy] must be: (1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental."*Stevenson v. Superior Court,* 16 Cal.4th 880, 894, 66 Cal.Rptr.2d 888, 941 P.2d 1157 (1997). Where discrimination is not alleged, a claim for wrongful discharge in violation of public policy requires a plaintiff to prove that: (1) he was employed by the defendant; (2) he was discharged; (3) his conduct was in furtherance of public policy FN3 and was a motivating reason for his discharge; and (4) the discharge caused the plaintiff harm. *See Haney v. Aramark Uniform Services, Inc.,* 121 Cal.App.4th 623, 641, 17 Cal.Rptr.3d 336 (2004); Judicial Council of California, Civil Jury Instructions ("CACI") § 2430 (Fall 2007 Ed.)."[A]n employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his 'reasonably based suspicions' of illegal activity."*Green v. Ralee Engineering Co.,* 19 Cal.4th 66, 87, 78 Cal.Rptr.2d 16, 960 P.2d 1046 (1998).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN3. Such conduct generally falls into four categories: "(1) refusing to violate a statute; (2) performing a statutory obligation; (3) exercising a statutory right or privilege; and (4) reporting an alleged violation of a statute of public importance."*Stevenson,* 16 Cal.4th at 889, 66 Cal.Rptr.2d 888, 941 P.2d 1157. The example given in CACI § 2430 for the third element of the cause of action is "plaintiff's refusal to engage in price fixing."CACI § 2430. This Court's use of the phrase "conduct in furtherance of a public policy" is meant to capture the categories of *Stevenson* and CACI's "price fixing" example. As applied to this case, CACI § 2430 may be read to require Mendes to show that: (1) he was employed by Lyles; (2) Lyles discharged him; (3) Mendes's complaining/reporting about the threatened failure to pay him for "drive time" was a motivating reason for his discharge; and (4) the discharge caused him harm.

**\*6** The Ninth Circuit has indicated that, "wrongful discharge claims based on public policy violations are not preempted by federal labor laws because such claims are derived from sources outside the [collective bargaining agreement]."*Sardikis v. United Airlines,* 166 F.3d 1272, 1278 (9th Cir.1999); *see also Paige v. Henry J. Kaiser Co.,* 826 F.2d 857, 862 (9th Cir.1987). Thus, the identification of an appropriate state public policy is paramount. *See Cook v. Lindsay Olive Growers,* 911 F.2d 233, 237-38 (9th Cir.1990); *Whittier v. Kaiser Found. Hosps.,* 2007 U.S. Dist. LEXIS 17129, \*10 (E.D.Cal.2007) ("In contrast, where there is no underlying independent state public policy being asserted, the claim is then, in essence, a claim for wrongful termination contrary to the CBA."). Here, the public policy identified in Mendes's complaint is that found in Labor Code § 222. That code section reads: "It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either wilfully or unlawfully

or with the intent to defraud an employee ..., to withhold from said employee any part of the wage agreed upon."Cal. Lab.Code § 222. Embodied within Section 200 et seq. of the California Labor Code is "a fundamental and substantial public policy protecting an employee's wages."*Phillips v. Gemini Moving Specialists,* 63 Cal.App.4th 563, 574, 74 Cal.Rptr.2d 29 (1998); *see Jersey v. John Muir Medical Center,* 97 Cal.App.4th 814, 824, 118 Cal.Rptr.2d 807 (2002).Labor Code § 222 is a substantial and fundamental state public policy. *See Jersey,* 97 Cal.App.4th at 824, 118 Cal.Rptr.2d 807;*Phillips,* 63 Cal.App.4th at 572-74, 74 Cal.Rptr.2d 29. A valid wrongful discharge against public policy claim may be stated where an employee alleges that he was fired because he asserted/exercised his right to receive the wages to which he is entitled. *See Jersey,* 97 Cal.App.4th at 824, 118 Cal.Rptr.2d 807;*Phillips,* 63 Cal.App.4th at 574, 74 Cal.Rptr.2d 29.

Lyles argues that in order to resolve this claim, provisions of the various collective bargaining agreements must be interpreted in order to determine such things as whether it had been paying Mendes the incorrect wage, what work Mendes was performing, which agreement controls, what is "just cause," etc. *See* Lyles Motion at pp. 3-5, 74 Cal.Rptr.2d 29. The Court cannot agree.

Mendes is contending that he was fired because he reported that he was about to be denied payment for driving to a job site, which he believed was contrary to the OEU. *See* FAC at ¶¶ 25-31. "Mendes told [his supervisor] that his pay, by law and by the [OEU], had to begin when he left the yard to proceed to the jobsite ..."*Id.* at ¶ 27, 74 Cal.Rptr.2d 29. "Mendes reported the illegal conduct of failing to pay for travel ... to [his supervisor]."*Id.* ¶ 28, 74 Cal.Rptr.2d 29. Mendes was allegedly terminated "for engaging in protected activity, which was the statutory right to receive the wage agreed upon under [§ 222]."*Id.* at ¶ 30.The day following his complaint/reporting, he was terminated. *See id.* at ¶ 32.

**\*7** What Mendes is complaining about is a form of

retaliation because he was fired after he reported or complained about conduct that he believed violated § 222. His act of reporting or complaining is what Mendes alleges caused his termination. It is Lyles's motivation that will determine if California public policy was violated; it is not whether the OEU or PUA were actually violated. *See Lingle,* 486 U.S. at 407;*Haney,* 121 Cal.App.4th at 641, 17 Cal.Rptr.3d 336; CACI § 2430. Mendes does not need to show that he was actually entitled to be paid for his driving time to a job site under the applicable collective bargaining agreement or that Labor Code § 222 was actually being violated. *See Green,* 19 Cal. at 87.Nor does he need to show which agreement controls, what work he was actually doing, or what constitutes "just cause" under the collective bargaining agreements. *See Lingle,* 486 U.S. at 413. The "issue ... is not whether [Mendes'] termination violated the collective bargaining agreement, but whether it violated California public policy." *Letch v. Safeway Stores, Inc.,* 2005 U.S. Dist. LEXIS 34304, *12 (N.D.Cal.2005). If a motivating reason in Lyles's decision to terminate Mendes was Mendes's reporting what he reasonably believed was unlawful activity, i.e. reporting that his supervisor was or would be violating § 222 by not paying for "drive time," then the discharge violated California public policy. *See Lingle,* 486 U.S. at 407;*Green,* 19 Cal.4th at 87, 78 Cal.Rptr.2d 16, 960 P.2d 1046;*Haney,* 121 Cal.App.4th at 641, 17 Cal.Rptr.3d 336;*Jersey,* 97 Cal.App.4th at 824, 118 Cal.Rptr.2d 807;*Phillips,* 63 Cal.App.4th at 572-74, 74 Cal.Rptr.2d 29; CACI § 2430. "[P]urely factual questions about an employee's conduct or an employer's conduct and motives do not require a court to interpret any term of a collective bargaining agreement."*Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 261, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994); *Lingle,* 486 U.S. at 407. Since at this point it is Lyles's motivation that is at issue, this is a "typical" wrongful/retaliatory discharge case in which interpretation of the collective bargaining agreement is unnecessary. *See Lingle,* 486 U.S. at 413. This claim will not be dismissed as preempted. *See Lingle,* 486 U.S. at 407-10;*Sardikis,* 166 F.3d at

1278;*Letch,* 2005 U.S. Dist. LEXIS 34304 at *11-*16; *Green,* 19 Cal.4th at 87, 78 Cal.Rptr.2d 16, 960 P.2d 1046;*Haney,* 121 Cal.App.4th at 641, 17 Cal.Rptr.3d 336;*Jersey,* 97 Cal.App.4th at 824, 118 Cal.Rptr.2d 807;*Phillips,* 63 Cal.App.4th at 572-74, 74 Cal.Rptr.2d 29; CACI § 2430.

## 2. Second Cause of Action-Non-Payment of Wages Per Labor Code § § 201, 222, & 227

Mendes alleges that, from March 23, 2000 to September 29, 2005, Lyles paid him an incorrect wage, referred to as the "utility rate." FAC ¶ 44. Without notice, beginning on the pay period ending October 6, 2005, Lyles increased Mendes's pay by $9.97 per hour. *Id.* at ¶ 45, 74 Cal.Rptr.2d 29. During the 2000 to 2005 period, Mendes's benefits were based on a rate that was lower by $9.97 per hour. *Id.* at ¶ 46, 74 Cal.Rptr.2d 29. Mendes contends that this conduct violated three Labor Code provisions, §§ 201, 222,[FN4]227, [FN5] and that he is owed the difference between old utility rate and the $9.97. FAC at ¶¶ 48-49. In his opposition, the only Labor Code section cited is § 203, and Mendes makes similar arguments to those made in regard to the first cause of action: the rights in Labor Code §§ 201, 222, and 227, are independent state rights and that no interpretation of the collective bargaining agreements is necessary. The Court cannot agree.[FN6]

> FN4.Labor Code § 222 reads, "It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either willfully or unlawfully or with intent to defraud an employee ... to withhold from said employee any part of the wage agreed upon."

> FN5.California Labor Code § 227 reads in full:

> Whenever an employer has agreed with any employee to make payments to a health or welfare fund, pension fund or

vacation plan, or other such plan for the benefit of the employees, or a negotiated industrial promotion fund, or has entered into a collective bargaining agreement providing for such payments, it shall be unlawful for such an employer willfully or with intent to defraud to fail to make the payments required by the terms of any such agreement. A violation of any provision of this section where the amount the employer failed to pay into the fund or funds exceeds five hundred dollars ($500) shall be punishable by imprisonment in the state prison for a period of not more than five years or in the county jail for a period of not more than one year, by a fine of not more than one thousand dollars ($1,000), or by both such imprisonment and fine. All other violations shall be punishable as a misdemeanor.

FN6.Labor Code § 203 provides penalties for the willful violation of Labor Code § 201. Mendes is requesting Labor Code § 203 penalties based on the precise conduct that is alleged to have violated § 201 under the Second Cause of Action. Since Mendes is alleging a willful violation of § 201, the Court will analyze his § 201 and § 203 claims together in the Third Cause of Action.

**\*8** Mendes's contention is that he was not paid the amount mandated by the operative OEU and the damages claimed is the difference between the amount that was agreed upon in the OEU and the lesser amount that he was actually paid. This claim is about a violation of a collective bargaining agreement. Mendes relies on Labor Code §§ 222 and 227, but those sections are wholly dependant upon what an employer and employee/union "agreed upon" and prohibit withholding or not paying the amount that was "agreed upon." *See*Cal. Lab.Code §§ 222, 227. Indeed, these sections specifically co-

dify and make "unlawful" a particular type of breach of a collective bargaining agreement: one involving the payments of wages and benefits.FN7Without a breach of the wage/benefit funds provisions of a collective bargaining agreement, there can be no violation of Labor Code §§ 222 or 227.

> FN7.Labor Code § 227 does not relate exclusively to collective bargaining agreements, unlike Labor Code § 222. Nevertheless, since a collective bargaining agreement is at issue in this case, and the collective bargaining agreement includes payment by Lyles' into pension funds for union members, *see* Teixeira Exhibit C, the Court will refer to Labor Code § 227 only in terms of a collective bargaining agreement.

The inquiry into this cause of action, under Labor Code §§ 222 and 227, would "begin and end" with the collective bargaining agreements. *Cf. Ramirez,* 998 F.2d at 748-49. Mendes would be required to show what was "agreed upon," that he fits within the parameters of what was "agreed upon," and that Lyles did not pay him the amount that was "agreed upon." In other words, Mendes must show that the provisions of the collective bargaining agreements were breached/violated. *Cf. Cornn v. UPS,* 2004 U.S. Dist. LEXIS 20578, \*3-\*5 (N.D.Cal.2004) (holding that a claim based on a failure to pay wages in violation of Labor Code §§ 222, 223 was preempted by the LMRA because the collective bargaining agreement would have to be interpreted). Where a state law "in essence create[s] a claim for breach of the collective bargaining agreement ... the law [falls] squarely within the scope of [LMRA] § 301 complete preemption."*Balcorta,* 208 F.3d at 1109 n. 11 (distinguishing a Third Circuit case); *Lueck,* 471 U.S. at 210. "State law causes of action for violation of a collective bargaining agreement-essentially breach of contract claims-are entirely displaced by section 301."*Parham v. Carrier Corp.,* 9 F.3d 383, 390 (5th

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 171003 (E.D.Cal.)
(Cite as: Slip Copy, 2008 WL 171003)

Page 9

Cir.1993); *see also Herman v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 971,* 60 F.3d 1375, 1380 n. 2 (9th Cir.1995). Given the allegations and damages claimed, this cause of action arises from a violation of, and depends on, a collective bargaining agreement and requires that a collective bargaining agreement be construed. Accordingly, Mendes's claims based on Labor Code §§ 222 and 227 for non-payment of wages are preempted by LMRA § 301. *See Lueck,* 471 U.S. at 210;*Balcorta,* 208 F.3d at 1109 n. 11;*Atchley v. Heritage Cable Vision Associates,* 101 F.3d 495, 499-500 (7th Cir.1996) ("Because the CBA must be interpreted, and because the claim of the local depends on the meaning of and is substantially dependent on analysis of the CBA, the claim, even though dressed in state-law clothing, is a federal § 301 claim."); *Antol v. Esposto,* 100 F.3d 1111, 1117, 1119-21 (3d Cir.1996) (holding a state statute preempted where it in essence created a claim for breach of a collective bargaining agreement); *Wheeler v. Graco Trucking Corp.,* 985 F.2d 108, 112-13 (3d Cir.1993) (rejecting argument that a state statute could be utilized to recover unpaid wages and holding that the "claim is based squarely on the terms of the collective bargaining agreement and therefore is governed exclusively by federal law."); *Cornn,* 2004 U.S. Dist. LEXIS 20578 at *3-*5.

### 3. Third Cause of Action-Waiting Time Penalties Per Labor Code § 203

*9 Mendes alleges that Lyles knew that it was paying him lower wages and benefits based on the improperly low utility rate and told him that it could pay the lower rate as per the OEU. *See* FAC at ¶ 54. Mendes alleges that, upon termination, Lyles failed to pay him the wages and increased benefits owed from March 23, 2000, through September 29, 2005, immediately upon termination, and continued not to pay for over 30 days thereafter. *See id.* at ¶ 55.Mendes alleges that Lyles's conduct was willful and that he is entitled to a penalty of $ 8,299.20. *See id.* at ¶¶ 54-55.

In relevant part, Labor Code § 203 provides, "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201..., any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."Cal. Lab.Code § 203. In relevant part, Labor Code § 201 reads, "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."Cal. Lab.Code § 201(a).

The duty created by Labor Code § 201 is for the immediate payment upon discharge of unpaid wages. *See*Cal. Lab.Code § 201; *Viceroy Gold Corp. v. Aubry,* 75 F.3d 482, 489 (9th Cir.1996). That duty exists by statute, cannot be waived, *see*Cal. Lab.Code § 219, and is not dependent upon a collective bargaining agreement. Similarly, the penalty under Labor Code § 203 is dependent upon a violation of Labor Code § 201, and exists irrespective of a collective bargaining agreement. The legal character of Labor Code §§ 201 and 203 are that of independent state law claims. *See Lividas v. Bradshaw,* 512 U.S. 107, 124-25, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *Balcorta v. 20th Century Fox Film Corp.,* 69 F.Supp.2d 1195, 1200-01 (N.D.Cal.1998).

Although independent, the Supreme Court has indicated that it may be possible for a Labor Code § 203 claim to be preempted. *See Lividas,* 512 U.S. at 125 n. 19. Nevertheless, at this point, the Court does not see that Mendes's Labor Code § 203 claim is preempted. The specific provisions identified by Lyles deal with determining the proper amount of Mendes's wages from March 2000 through September 2005. While these provisions will impact whether wages were owed, they will not impact the penalty for violating Labor Code § 203. Importantly, the Court does not see a dispute among the parties that, if wages were still owed upon his termination in December 2006, the penalty would be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

approximately $8,300. FAC at ¶ 55. *Cf. Livadas,* 512 U.S. at 125 (noting that the parties did not dispute the amount of the penalty). The Supreme Court has explained, "as a general proposition, a state law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and a separate state law analysis that does not turn on the agreement. In such a case, federal law would govern the interpretation of the agreement, but the separate state law analysis would not be thereby preempted."*Lingle,* 486 U.S. at 413 n. 12. Whether wages were owed under the collective bargaining agreements is a question governed by federal law; once that question is answered, the independent § 203 claim will remain and will not be pre-empted. *See Livadas,* 512 U.S. at 125;*Lingle,* 486 U.S. at 413 n. 12;*Gulden,* 890 F.2d at 199 n. 5. In other words, once it is determined whether wages were owed to Mendes upon his termination and for 30 days thereafter, the penalty will be $8,300. At this time, this claim is not preempted. *See Livadas,* 512 U.S. at 125;*Lingle,* 486 U.S. at 413 n. 12 (1988); *Gulden,* 890 F.2d at 199 n. 5;*Balcorta,* 69 F.Supp.2d at 1200-01.

### 4. Failure To Exhaust Remedies Under The OEU's

**\*10** Lyles's exhaustion argument is limited to claims based on alleged underpaying from March 2000 through September 2005-the Second and Third Causes of Action. *See* Lyles's Motion at 10:14-20 & n. 2. Lyles argues that Mendes was required to file grievances as required by Sections 4.03.02 and 18.00.00 of the 2002 to 2006 OEU and Section 5.00.00 of the PUA.

Initially, the pre-July 2006 PUA has not been provided to the Court. *See* Teixeira Declaration at ¶ 6. Instead, the current PUA agreement has been submitted. *See* Teixeira Exhibit E. Mendes objects to consideration of the current PUA since it does not govern his claims from March 2000 through September 2005. The Court agrees. Lyles is improperly relying on a document that had no impact

on wages or Mendes's employment prior to July 2006. The Court will not consider the current PUA (Teixeira Exhibit E) in resolving this motion.

It appears that the same can be said of the current OEU. The current OEU was not in force from March 2000 through September 2005. In its reply, Lyles indicates that the current OEU does not apply to Mendes's wage claim. *See* Lyles' Reply at 9:10-11. Neither side, however, objects specifically to consideration of the current OEU. Nevertheless, since it does not appear that Mendes's claim depends on the current OEU (Teixeira Exhibit D), the Court will not consider it in resolving this claim.

Thus, the only document that has been provided and that was in force during the March 2000 through September 2005 time period is the 2002-2006 OEU (Teixeira Exhibit C). The Court will consider this document in resolving this claim.FN8*See Parrino,* 146 F.3d at 705-06.

> FN8. The Court gave notice to the parties that it intended to consider Exhibits C, D, and E of the Teixeira declaration in resolving this motion. *See* Court's Docket Doc. No. 19. Mendes filed objections: (1) that the Teixeira declaration was not filed concurrently with the motion to dismiss; (2) to considering the current PUA since it does not apply to the pre-2006 wage claims; (3) and to the Court's characterization of the opposition as not expressly addressing the particular provisions of bargaining agreements that were identified by Lyles. *See* Court's Docket Doc. No. 20. With respect to the first objection, the Teixeira Declaration was filed with the prior motion to dismiss and the notice of the current motion to dismiss states that it is based in part on "Declaration of Matt Teixeira (filed September 5, 2007)."*See* Court's Docket Doc. No. 9. Further, the memorandum in support of the motion to dismiss cited the Teixeira declaration. Under these circumstances, there was no need to file the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Teixeira declaration a second time. The objection is overruled. With respect to the current PUA, the Court is not considering that document. With respect to the objection to the Court's characterization of his opposition, it is not an objection that goes to authenticity or reliance.*See Parrino,* 146 F.3d at 705-06. The objection is inaccurate and immaterial and, therefore, overruled.

Before bringing suit under LMRA § 301 to enforce the terms of a collective bargaining agreement, an employee must first exhaust the grievance procedures established by the collective bargaining agreement. *Sidhu v. Flecto, Inc.,* 279 F.3d 896, 898 (9th Cir.2002); *Herman,* 60 F.3d at 1380;*Carr v. Pacific Maritime Ass'n,* 904 F.2d 1313, 1317 (9th Cir.1990)."Failure to utilize the grievance procedures, or to invoke them in a timely manner, bars grievants from pursuing remedies in court."*Carr,* 904 F.2d at 1317. However, an employee need not exhaust grievance procedures where the employer repudiates the specific grievance procedures provided for in the collective bargaining agreement. *Sidhu,* 279 F.3d at 899;*Herman,* 60 F.3d at 1380. Exhaustion may also be excused where the union breaches its duty of fair representation by acting arbitrarily, discriminatorily, or in bad faith towards the employee/member, such as by ignoring a meritorious claim or perfunctorily processing the grievance claim. *See Herman,* 60 F.3d at 1380;*Zuniga v. United Can Co.,* 812 F.2d 443, 451 (9th Cir.1988). No breach of the duty of fair representation occurs where a meritless grievance is not processed, the union engages in mere negligent conduct, or the union makes a simple error in evaluating the merits. *See Zuniga,* 812 F.2d at 451.

**\*11** Lyles relies on two provisions of the 2002-2006 OEU, Sections 4.03.02 and 18.00.00. Section 4.03.02 deals with discharges without 'just cause' " and states that disputes over the existence of "just cause" will be determined under the grievance procedure of Section 18.00.00. *See* Teixeira Exhibit C. Lyles's argument is limited to the

Second and Third Causes of Action, and those causes of action are for non-payment of wages; they have nothing to do with whether there was a "just cause" discharge. Section 4.03.02 is not relevant to the Second and Third Causes of Action.

Section 18.00.00 is entitled "Provisions Governing Right to Arbitrate." *Id.* Section 18.01.00 reads, "No dispute, complaint or grievance concerning the interpretation, application, or compliance with any provision or provisions of 04.00.00, 12.00.00, 19.00.00, and 20.00.00 is or are arbitrable under the provisions of this Section 18.00.00 of this Agreement."*Id.* Section 18.02.00 reads, "All other disputes, complaints and grievances are the subject of arbitration as follows."*Id.* Section 4.00.00 is entitled "Employment." Topics under this section include "Hiring," "Union Security," "Discharge of Employee," and "Owner Operators." *Id.* Section 12.00.00 is entitled "Fringe Benefits," and provides for the payments into such funds as "Health and Welfare and Sick Benefits," "Pensioned Health and Welfare," "Pension," "Annuity," etc.*Id.* Wage rates are found in Section 1.00.00 and Section 10.02.00 deals with and is entitled "Payment of Wages." *Id.*

Mendes contends that his wage claims are governed by Section 4.00.00. Lyles does not expressly dispute this. With respect to fringe benefits, for example payments into pension funds, such payments are considered "wages" for purposes of Labor Code § 203. *See*Cal. Labor Code § 200; *Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.,* 102 Cal.App.4th 765, 780-81, 125 Cal.Rptr.2d 804 (2002); *Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 24 Cal.App.3d 35, 44, 100 Cal.Rptr. 791 (1972). Further, the 2002 to 2006 OEU provisions regarding fringe benefits are found in Section 12.00.00. That section is expressly excepted from the Section 18.00.00 grievance process. *See* Teixeira Exhibit C at ¶ 18.01.00. Lyles has not sufficiently shown that a claim for improper payment of fringe benefits must be grieved through Section 18.00.00. Dismissal of the unpaid fringe benefit claims on the basis of lack of exhaustion is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 12
Slip Copy, 2008 WL 171003 (E.D.Cal.)
**(Cite as: Slip Copy, 2008 WL 171003)**

inappropriate.

With respect to wage rates, a review of Section 4.00.00 does not include a section that deals with wage rates or payment of wages. Instead, it appears to the Court that the wage rate and payment provisions are found in Sections 1.00.00 and 10.02.00. *See* Teixeira Exhibit C. The closest instance where wage rates are addressed in Section 4.00.00 is in sections that deals with "Owner-Operators" who elect either to go or not to go on the payroll of "employers." *See id.* at §§ 4.04.12, 4.04.13. Section 4.04.19 does state that "it is the intent of this Section to assure the payment of wages, subsistence and fringe benefit payments ... and to prohibit the making and carrying out any plan ... to circumvent or defeat the payment of wages, subsistence and fringe benefit payments and the observance of the conditions provided in this Master Agreement."However, this provision is part of a subsection that deals with "Owner-Operators" and the sections immediately adjacent to this section, Sections 4.04.18 and 4.04.20 (as well as nearly every other subsection of Section 4.04.00), all specifically contain the term "Owner-Operator." Mendes does not allege that he is an "Owner-Operator" nor does he identify the specific provision of Section 4.00.00 that would excuse not grieving the payment of an improper wage rate. At this point, the Court does not see how his claim for payment of an improper wage rate falls under Section 4.00.00. [FN9]

> FN9. Section 4.04.07 of the 2002-2006 OEU indicates that there are Sections 4.05.00 through 4.12.00. *See* Teixeira Exhibit C. The copy of the 2002-2006 OEU provided to the Court contains a Section 4.04.22 and then immediately, and without a break in printing, proceeds to Section 5.00.00. *See id.*The Court does not know what Sections 4.05.00 through 4.12.00 are, what they provide, or whether they deal with payment of wages or wage rates.

**\*12** Instead, the wage claims would appear to be governed by Section 1.00.00, and that section is not

exempted from Section 18.00.00. *See* Teixeira Exhibit C. Although Mendes does allege that he contacted his union representative, in context, it appears that he only contacted his representative regarding his discharge since he only complained when he discovered that he had been replaced and that business was not slow. *See* FAC at ¶¶ 61-63. The FAC does not sufficiently allege compliance, or excuse from complying, with the arbitration/ grievance provision (Section 18.00.00) of the 2002-2006 OEU as to Mendes's incorrect "wage rate" claim. Dismissal of the unpaid "wage rate" claim for lack of exhaustion of the grievance process is appropriate.

**5. Leave To Amend**

The Second Cause of Action will be dismissed because Mendes's claims based on violations of Labor Code §§ 222 and 227 are preempted by LMRA § 301. The Court sees no way that these claims may be pled as independent, state law causes of action. However, since these statutory sections are essentially for violations/breaches of a collective bargaining agreement, Mendes's claims for unpaid wage rate and unpaid fringe benefits may be repled as violations of a collective bargaining agreement.

However, there is a problem with exhaustion of remedies with respect to the claim for unpaid wages, i.e. payment of a lower wage rate. Mendes has not adequately identified which provisions of Section 4.00.00 apply and/or how he fits within Section 4.00.00's coverage. At this point, it is not clear that Mendes would be unable to plead compliance or some form of excuse with respect to Section 18.00.00. In addition to repleading his claim for "unpaid wage rate" as a violation of a collective bargaining agreement, Mendes will also need to plead excuse or compliance with the grievance procedures as to this claim.

There appears to be no exhaustion problem with respect to unpaid fringe benefits. Accordingly, Mendes need only replead this wage claim as a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 171003 (E.D.Cal.)
**(Cite as: Slip Copy, 2008 WL 171003)**

breach of a collective bargaining agreement.

## CONCLUSION

Lyles moves to dismiss the First, Second, Third, and Fifth Causes of Action as preempted by LMRA § 301. As to the First Cause of Action, the claim is that Lyles terminated Mendes because Mendes reported a possible violation of Labor Code § 222 or insisted that § 222 be followed. Labor Code § 222 embodies an important state public policy. Further, no provision of an OEU or PUA need be interpreted since this cause of action is not based on an actual violation of a collective bargaining agreements or an actual violation of Labor Code § 222. Instead, Mendes need only show that Lyles terminated him because he reported a reasonable belief of a Labor Code § 222 violation. Determining Lyles's motivation for terminating Mendes does not require the interpretation of a collective bargaining agreement. The First Cause of Action will not be dismissed.

As to the Second Cause of Action for violation of Labor Code §§ 222 and 227, those claims are based on what was "agreed upon" and essentially create a cause of action for a particular type of breach of a collective bargaining agreement. Construing collective bargaining agreements would be required to resolve these claims. These claims are preempted by LMRA § 301. Dismissal is appropriate, but Mendes may amend his complaint to plead his claims for unpaid "wage rate" and fringe benefits as violations of a collective bargaining agreement.

*13 As to the Third Cause of Action, the duty to pay all unpaid "wages" immediately upon termination (Labor Code § 201) and the penalty for the willful failure to do so (Labor Code § 203) are independent state law claims. There does not appear to be a dispute regarding the amount of the penalty if wages were owed at termination. Mendes's claim for unpaid wages will determine whether wages were owed, and that question is governed by federal law. However, once that question is determined, Mendes's Labor Code § 203 claim may proceed

without preemption.

As to the Fifth cause of action, Mendes admits that the claim is preempted.

As to the failure to exhaust grievance procedures, the claims for unpaid fringe benefits appear to be exempt from the OEU's grievance section. The claim for unpaid "wage rate," however, appears to be governed by sections that are not exempt from the grievance procedure. Mendes has not adequately identified which provisions of Section 4.00.00 apply and/or how he fits within Section 4.00.00's coverage, and thus, has not adequately alleged compliance with or excuse from Section 18.00.00. Therefore, Mendes will have to allege some form of excuse or compliance with the appropriate grievance procedures with respect to his claim for unpaid hourly rate.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendant's Motion to Dismiss the First Cause of Action is DENIED;

2. Defendant's Motion to Dismiss the Second Cause of Action is GRANTED with leave to amend;

3. Defendant's Motion to Dismiss the Third Cause of Action is DENIED;

4. Defendant's Motion to Dismiss the Fifth Cause of Action is GRANTED;

5. Plaintiff may file an amended complaint within two weeks of service of this order; and

6. If Plaintiff fails to file an amended complaint, then within three weeks of service of this order, Defendant shall file an answer to the current complaint consistent with the holdings of this order.

IT IS SO ORDERED.

E.D.Cal.,2008.
Mendes v. W.M. Lyles Co.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                  Page 14
Slip Copy, 2008 WL 171003 (E.D.Cal.)
**(Cite as: Slip Copy, 2008 WL 171003)**

Slip Copy, 2008 WL 171003 (E.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 5

Westlaw.

Slip Copy
Slip Copy, 2008 WL 501392 (N.D.Cal.)
(Cite as: Slip Copy, 2008 WL 501392)

Page 1

Mitchell v. Mirant California, LLC
N.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Jerry MITCHELL, et al., Plaintiffs,
v.
MIRANT CALIFORNIA, LLC, Defendant.
No. C 07-05847 PJH.

Feb. 21, 2008.

Daniel Barnett Siegel, Berkeley, CA, Jonathan E.
Gertler, Dan Leo Gildor, Chavez & Gertler LLP,
Mill Valley, CA, for Plaintiffs.
Kimberly Lynn Owens, Margaret Hart Edwards,
Philip Lane Ross, Littler Mendelson, San Fran-
cisco, CA, for Defendant.

**ORDER GRANTING MOTION TO REMAND
AND GRANTING MOTION TO DISMISS
COUNTERCLAIM**

PHYLLIS J. HAMILTON, District Judge.
*1 On February 20, 2008, the court heard argument
in plaintiffs' motion to remand and motion for attor-
ney's fees; in the motion of plaintiffs and counter-
defendants Jerry Mitchell, Eddie Williams, Jr., Ed-
ward S. Medina, and David Walters to strike or dis-
miss the counterclaim; and in the motion of coun-
terdefendant International Brotherhood of Electrical
Workers Local 1245 ("Local 1245") to dismiss the
counterclaim. Plaintiffs appeared by their counsel
Daniel B. Siegel and Dan L. Gildor; Local 1245 ap-
peared by its counsel Philip C. Monrad; and de-
fendant appeared by its counsel Margaret Hart Ed-
wards and Kimberly L. Owens.

Having read the parties' papers and carefully con-
sidered their arguments and the relevant legal au-
thority, and good cause appearing, the court hereby
GRANTS the motion to remand, DENIES the mo-
tion for fees, and GRANTS the motions to dismiss
the counterclaims as follows and for the reasons
stated at the hearing.

**BACKGROUND**

The named plaintiffs in this proposed class action
are four individuals who work for defendant Mirant
California, LLC ("Mirant"), a company that oper-
ates power plants and sells electricity. Plaintiffs are
power plant operators seeking to represent a class
of more than 80 individuals.

Plaintiffs filed the original complaint in San Fran-
cisco Superior Court on October 17, 2007, alleging
three causes of action under the California Labor
Code (failure to provide meal periods, failure to
provide rest periods, and recovery of waiting time
penalties), a claim under Business & Professions
Code § 17200, and a claim for declaratory relief.

Mirant removed the action on November 19, 2007,
alleging federal question jurisdiction. Mirant claims
that plaintiffs' claims arise under § 301 of the
Labor-Management Relations Act ("LMRA"), 29
U.S .C. § 185. Under § 301, federal law exclusively
governs suits for violation of contracts between an
employer and a labor organization representing em-
ployees in an industry affecting commerce. *Cater-
pillar, Inc. v. Williams,* 482 U.S. 386, 394, 107
S.Ct. 2425, 96 L.Ed.2d 318 (1987).

Specifically, Mirant asserts that plaintiffs' claims
directly reference and require substantial interpreta-
tion of a disputed term of a collective bargaining
agreement ("CBA") between Mirant and the Inter-
national Brotherhood of Electrical Workers, Local
1245 ("Local 1245"), and that the action is there-
fore preempted by § 301.

On November 28, 2007, Mirant filed a counter-
claim against the named plaintiffs and Local 1245,
asserting a single cause of action for declaratory re-
lief, which seeks an interpretation of the provisions
in the CBA that govern meal and rest periods, and
an agreement regarding "on duty" meal periods.

On January 11, 2008, Local 1245 filed a motion to
dismiss Mirant's counterclaim for lack of jurisdic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 501392 (N.D.Cal.)
**(Cite as: Slip Copy, 2008 WL 501392)**

Page 2

tion and for failure to join an indispensable party. On January 14, 2008, plaintiffs filed a motion to remand and a request for fees, and also filed a motion to dismiss the counterclaim as redundant of plaintiff's claim for declaratory relief, for lack of jurisdiction, and for failure to state a claim. All these motions are now before the court.

## DISCUSSION

A. Motion to Remand and Motion for Attorney's Fees

**\*2** A defendant may remove a civil action filed in state court if the action could have originally been filed in federal court. 28 U.S.C. § 1441. A plaintiff may seek to have a case remanded to the state court from which it was removed if the district court lacks jurisdiction or if there is a defect in the removal procedure. 28 U .S.C. § 1447(c).

The removal statutes are construed restrictively, so as to limit removal jurisdiction. *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108-09, 61 S.Ct. 868, 85 L.Ed. 1214 (1941). There is a "strong presumption" against removal jurisdiction. *Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992). The burden of establishing federal jurisdiction for purposes of removal is on the party seeking removal. *Valdez v. Allstate Ins. Co.,* 372 F.3d 1115, 1117 (9th Cir.2004). Doubts as to removability are resolved in favor of remanding the case to state court. *Matheson v. Progressive Specialty Ins. Co.,* 319 F.3d 1089, 1090 (9th Cir.2003).

Plaintiffs argue that the case must be remanded because there is no § 301 preemption, and thus, no federal question. They also seek fees incurred in connection with their motion to remand.

"Federal question" cases are those cases "arising under the constitution, laws, or treaties of the United States."*Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (quoting 28 U.S.C. § 1331). The presence or

absence of federal question jurisdiction is governed by the "well-pleaded complaint" rule, which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *Caterpillar,* 482 U.S. at 392.

This rule makes the plaintiff the master of his complaint, and allows him to avoid federal jurisdiction by relying exclusively on state law. Thus, a case may not be removed to federal court on the basis of a federal defense, including a claim of preemption, even if the defense is anticipated in the complaint. *Franchise Tax Bd. of State of Calif. v. Construction Laborers Vacation Trust for Southern Calif.,* 463 U.S. 1, 14, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983).

There also exists a corollary to the "well-pleaded complaint" rule-the "complete preemption doctrine"-under which the preemptive force of some statutes is so strong that they "completely preempt" an area of state law.*Metropolitan Life Ins.,* 481 U.S. at 65. In such a case, a claim based on that preempted state law is considered, from its inception, a federal claim, and therefore "arises under" federal law. *Franchise Tax Bd.,* 463 U.S. at 24.

The "complete preemption" exception to the "well-pleaded complaint" rule is applied primarily under § 301 of the LMRA. Section 301 provides that

> [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in the Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

**\*3** 29 U.S.C. § 185(a). Although § 301 is limited to "[s]uits for violation of contracts," courts have concluded that in order to support § 301's policies of promoting arbitration and the uniform interpretation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of collective bargaining agreements, § 301 "complete preemption" must be construed to cover most state-law actions that require "interpretation of labor agreements." *Associated Builders & Contractors, Inc. v. Local 302 Int'l Bhd. of Elec. Workers,* 109 F.3d 1353, 1356 (9th Cir.1997).

However, not every claim that requires a court to refer to the language of a collective bargaining agreement is necessarily preempted. *Id.* at 1357.If the right asserted by the plaintiff exists independently of the CBA, the court must consider whether it is nevertheless "substantially dependent on analysis of a collective bargaining agreement."*Caterpillar,* 482 U.S. at 394 (citation and quotation omitted). To determine whether a state law claim is "substantially dependent" on the terms of a CBA, the court must decide whether the claim can be resolved by "look[ing] to" the CBA, as opposed to interpreting it. *Livadas v. Bradshaw,* 512 U.S. 107, 123-26, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). If the claim does not require interpreting the CBA, it is not preempted.

Here, the court finds that while resolution of plaintiffs' claims-the determination whether Mirant has denied plaintiffs and the proposed class members meal and rest breaks in violation of California law-may require the court to look at the provisions of the CBA, it will not require any substantial interpretation of the CBA. Accordingly, the court finds there is no complete preemption, and that the motion to remand must be GRANTED, based on lack of subject matter jurisdiction.

Plaintiffs also argue that they are entitled to attorney's fees under 28 U.S.C. § 1447, which provides, in part, that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."28 U.S.C. § 1447(c).

There is no automatic entitlement to an attorney's fee award on remand, and no presumption in favor of-or against-granting fees and costs. *Martin v. Franklin Capital Corp.,* 546 U.S. 132, 137, 126

S.Ct. 704, 163 L.Ed.2d 547 (2005). The key factor is the propriety of the removal. "[A]bsent unusual circumstances, attorney's fees should not be awarded when the removing party has an objectively reasonable basis for removal."*Id.* at 136.

Here, the court finds that the removal was not entirely objectively unreasonable. In particular, the court finds that the inclusion in the complaint of the allegations regarding the CBA likely contributed to Mirant's view of plaintiff's claims as requiring some construction or interpretation of the CBA. Accordingly, the court finds that the motion for fees must be DENIED.

B. Motions to Dismiss Counterclaim

Both plaintiffs and Local 1245 have moved to dismiss the counterclaim. In its notice of removal, Mirant asserted that removal

> *4 is based on a claim arising under federal law. Specifically, [p]laintiffs' claims directly reference and require substantial interpretation of a disputed term of a collective bargaining agreement ("CBA") between an Employer and a Union. Therefore, the action is preempted by Section 301 of the LMRA, 29 U.S.C. § 185.

Notice of Removal ¶ 7.

In the counterclaim, Mirant alleged that the court has supplemental jurisdiction of the counterclaim under 28 U.S.C. § 1367(a)"because it arises out of the same transaction or occurrence that is the subject matter of" the complaint;" and that the court has original jurisdiction of the counterclaim under § 301 of the LMRA "because this counterclaim seeks interpretation of the [CBA] between Mirant and ... Local 1245" and "requests a declaratory judgment as to rights and obligations under the CBA."Counterclaim ¶¶ 1, 2.

In order to exercise supplemental jurisdiction over a counterclaim, the court must first have original jurisdiction over the complaint. *Herman Family*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 501392 (N.D.Cal.)
**(Cite as: Slip Copy, 2008 WL 501392)**

Page 4

*Rev. Trust v. Teddy Bear,* 254 F.3d 802, 805 (9th Cir.2001). In view of the finding that the case was improperly removed because there is no § 301 preemption and therefore no federal question jurisdiction, the court cannot exercise supplemental jurisdiction over the counterclaim. Thus, the only question is whether the court has original jurisdiction over the counterclaim.

There are two independent reasons that the court does not have original federal subject-matter jurisdiction over Mirant's counterclaim. First, a counterclaim cannot serve as the basis for original federal question subject matter jurisdiction. Second, Mirant's claim for declaratory relief regarding the CBA does not create federal question jurisdiction under LMRA § 301.

1. Counterclaim cannot create original federal question jurisdiction

If the complaint fails to state a claim "arising under" federal law, the fact that the counterclaim asserts such a claim does not give the court subject matter jurisdiction over the action. *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.,* 535 U.S. 826, 830-31, 122 S.Ct. 1889, 153 L.Ed.2d 13 (2002).

In *Holmes,* a household fan manufacturer (Holmes) filed suit in federal court seeking a declaratory judgment that its products did not infringe the trade dress of a competitor (Vornado). Vornado's answer asserted a compulsory counterclaim alleging patent infringement. The district court granted the declaratory judgment, and the Tenth Circuit affirmed. Vornado appealed to the Federal Circuit, which remanded the case for further consideration in light of a Supreme Court decision issued after the district court had ruled.

The Supreme Court granted certiorari to consider whether the Federal Circuit had properly asserted jurisdiction over the appeal. The Federal Circuit had exercised jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (jurisdiction over appeal from final de-

cision of district court if jurisdiction of that court was based on 28 U.S.C. § 1338-actions relating to patents). The Supreme Court held that the "well-pleaded complaint" rule, which provides that whether a case "arises under" federal law, must be determined from the plaintiff's statement of his own claim in the complaint. *Holmes,* 535 U.S. at 830-31.

*5 The Court concluded that because the question whether a case arises under federal patent law cannot depend on the answer to the complaint, "[i]t follows that a counterclaim-which appears as part of a defendant's answer, not as part of the plaintiff's complaint-cannot serve as the basis for 'arising under' jurisdiction."*Id.* at 831.

Although the *Holmes* case involved the narrower question of a challenge to the Federal Circuit's exercise of jurisdiction over a patent infringement counterclaim, the general rule articulated by the Court can be extended to this case. In particular, the Court noted that the "well-pleaded complaint" rule "has long governed whether a case 'arises under' federal law for purposes of § 1331," and then noted that the "well-pleaded complaint" rule had "appropriately" been adapted to § 1338(a).*Id.* at 830 (quotation and citation omitted).

The Court added that " '[l]inguistic consistency' requires us to apply the same test to determine whether a case arises under § 1338(a) as under § 1331."*Id.* It was because Vornado's well-pleaded complaint did not assert any claim arising under federal patent law that the Court concluded that the Federal Circuit had erred in asserting jurisdiction over the appeal. *Id.*

2. Counterclaim does not state federal question claim under LMRA § 301

The counterclaim is brought under the Declaratory Judgment Act, which provides, in part, that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

party seeking such declaration, whether or not further relief is or could be sought."28 U.S.C. § 2201(a). Thus, the party seeking declaratory relief must show the existence of an actual controversy regarding subject matter within federal court jurisdiction.

In the counterclaim, Mirant alleges that "[a]n actual controversy has arisen between [p]laintiffs and IBEW Local 1245, on the one hand, and Mirant, on the other hand."Counterclaim ¶ 21. Mirant asserts that "[t]he parties dispute the validity of a contract and dispute the meaning of terms of a contract," and that "[d]eclaratory relief is also required to determine Mirant's rights and obligations with respect to the claims asserted by [p]laintiffs in their Complaint."*Id.*

Mirant claims that "[t]he parties dispute the interpretation of [§§ 16.5 and 16.7 of the CBA and the agreement regarding waiver of second meal periods] and thus require an interpretation of the CBA and other agreements between the parties, and a determination as to their respective rights and obligations with respect thereto."*Id.* ¶ 22.Mirant seeks a judicial declaration "that Sections 16.5 and 16.7 of the CBA and the agreement regarding waiver of second meal periods were and are enforceable and not inconsistent with or in violation of any California statute or administrative regulations."*Id.*, Prayer for Relief, ¶ 1.

**\*6** The Declaratory Judgment Act creates a federal remedy; it does not provide an independent basis for federal jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). Before declaratory relief can be granted, federal subject matter jurisdiction requirements must be satisfied. *Id.* Thus, actions for declaratory relief must either be between parties of diverse citizenship, or "arise under" federal law. 28 U.S.C. §§ 1331, 1332.

In declaratory relief actions, whether a question "arises under" federal law is determined by the nature of the underlying coercive claim-that is, the

claim that the declaratory judgment defendant may conceivably assert against the declaratory judgment plaintiff. As the Supreme Court has noted, "Federal courts have regularly taken jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question."*Franchise Tax Bd.,* 463 U.S. at 19.

If, on the other hand, the underlying coercive claim does not "arise under" federal law, there is no federal question jurisdiction over the declaratory judgment cause of action. *Republican Party of Guam v. Gutierrez,* 277 F.3d 1086, 1090 (9th Cir.2002). Moreover, if the federal claim would arise only as a defense to a state-law cause of action, there is no federal jurisdiction.*Franchise Tax Bd.,* 463 U.S. at 16.

As indicated above, Mirant argues that the basis for original jurisdiction is § 301 of the LMRA. "By its terms, [§ 301] confers federal subject-matter jurisdiction only over "[s]uits for violation of contracts."*Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. United Auto., Aerospace, and Agr. Implement Workers of America,* 523 U.S. 653, 656, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998)." 'Suits for violation of contracts' under § 301 are not suits that claim a contract is invalid, but suits that claim that a contract has been violated."*Id.* at 658.

In *Textron,* the union sought a declaratory judgment that its CBA with the employer (Textron) was invalid, after Textron announced that it would subcontract out a substantial volume of work, causing half the members of the union to lose their jobs. The union asserted that Textron had fraudulently induced it to sign the agreement by concealing its plans to subcontract work. The union did not allege, however, that Textron had ever violated the terms of the CBA. The Supreme Court concluded that because the complaint alleged no violation of the CBA, "neither we nor the federal courts below have subject matter jurisdiction over this case under § 301(a) of the [LMRA]."*Id.* at 661-62.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Court explained further that "[t]his does not
mean that a federal court can never adjudicate the
validity of a contract under § 301."*Id.* at 657.For
example, if, in a suit alleging that the defendant vi-
olated the CBA, the defendant interposes as an af-
firmative defense the allegation that the contract
was invalid, or if a declaratory-judgment plaintiff
accused of violating a CBA asks the court to de-
clare the agreement invalid, the federal court can
adjudicate the question of the contract's validity.
"But in these cases, the federal court's power to ad-
judicate the contract's validity is ancillary to, and
not independent of, its power to adjudicate "[s]uits
for violation of contracts."*Id.* at 658.

\*7 Here, neither the plaintiffs' claims in the com-
plaint, nor the declaratory judgment counterclaim,
nor the "threatened coercive action" (the plaintiffs'
state law claims) can be viewed as a claim that the
CBA was violated by either Mirant or Local 1245.
The court also notes that Mirant did not allege fed-
eral question jurisdiction under 28 U.S.C. § 1331,
but only under LMRA § 301. Specific jurisdictional
provisions such as § 301 are grants of jurisdiction
over cases in which the claimant is pressing a par-
ticular federal cause of action-in the case of § 301,
it is a suit for violation of a contract between an
employer and a labor organization.

## CONCLUSION

In accordance with the foregoing, the court
GRANTS the motion to remand, DENIES the mo-
tion for attorney's fees, and GRANTS the motions
to dismiss for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

N.D.Cal.,2008.
Mitchell v. Mirant California, LLC
Slip Copy, 2008 WL 501392 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 6

Westlaw.

Slip Copy
Slip Copy, 2007 WL 2993276 (E.D.Cal.)
**(Cite as: Slip Copy, 2007 WL 2993276)**

**H**
Nguyen v. University of California
E.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. California.
Vu NGUYEN, Plaintiff,
v.
UNIVERSITY OF CALIFORNIA, et al., Defendants.
**No. CIV S-06-1579 FCD KJM PS.**

Oct. 11, 2007.

Vu T. Nguyen, Sacramento, CA, pro se.
George A. Acero, Porter Scott, Sacramento, CA, for
Defendants.

*FINDINGS AND RECOMMENDATIONS*

KIMBERLY J. MUELLER, U.S. Magistrate Judge.
*1 Defendants' motion to dismiss is pending before
the court. Upon review of the documents in support
and opposition, and good cause appearing therefor,
THE COURT FINDS AS FOLLOWS:

This case arises out of plaintiff's employment in the
Department of Dermatology at UC Davis and his
termination therefrom in July 2004. Plaintiff names
as defendants the University of California, Davis
("UCD") and three individuals. Plaintiff alleges two
causes of action. The first cause of action is under
the California Whistleblower Protection Act
("WPA"), California Government Code § 8547 *et
seq.;* the second cause of action is under 42 U.S.C.
§ 1983 for infringement of plaintiff's First Amend-
ment rights of free speech on matters of public con-
cern. The gravamen of plaintiff's claims is that al-
legedly the laboratory in which plaintiff was em-
ployed committed fraud in research on skin cells,
plaintiff reported the fraud, and plaintiff was ter-
minated from his position with the University for
reporting the fraud.

Defendants move to dismiss under Federal Rule of
Civil Procedure 12(b)(6). Both plaintiff and defend-

ants request the court take judicial notice of docu-
ments submitted in connection with the pending
motion. The court takes judicial notice of those
documents submitted by both plaintiff and defend-
ant that are part of the administrative proceedings
of the grievance plaintiff filed with the University
regarding his termination.

Defendant UCD moves to dismiss on the ground
the University is immune from suit under the Elev-
enth Amendment. UCD is considered an instru-
mentality of the State for Eleventh Amendment
purposes. *Thompson v. Los Angeles,* 885 F.2d 1439,
1442-43 (9th Cir.1989). The action against UCD
accordingly cannot be maintained in federal court
and this defendant should be dismissed.

The individual defendants contend all of the claims
under 42 U.S.C. § 1983, except for the claim re-
lated to plaintiff's termination,[FN1] are barred by
the statute of limitations. Actions brought under
section 1983 are governed by the statute of limita-
tions for personal injury actions of the forum state.
*See, e.g., Jones v. Blanas,* 393 F.3d 918, 927 (9th
Cir.2004). California law provides for a two year
statute    of    limitations    for    personal
injury.Cal.Civ.Proc.Code § 335.1. The pendency of
a grievance, or some other method of collateral re-
view of an employment decision, does not toll the
running of the limitations periods. *Delaware State
College v. Ricks,* 449 U.S. 250, 261, 101 S.Ct. 498,
66 L.Ed.2d 431 (1980). This action was filed July
17, 2006. Plaintiff complains of a variety of actions
taken by defendants, most of which occurred prior
to July 17, 2004. The claims accruing prior to July
17, 2004 accordingly are time barred.

> FN1. Defendants contend in their moving
> papers that all of plaintiff's section 1983
> claims are barred by the statute of limita-
> tions. Plaintiff, however, did not receive
> notice of the termination until receipt of a
> letter of dismissal dated July 15, 2004. *See*
> Plaintiff's Exhibit 21. The statute of limita-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 2
Slip Copy, 2007 WL 2993276 (E.D.Cal.)
**(Cite as: Slip Copy, 2007 WL 2993276)**

tions begins to run on the date the decision is made and communicated to the plaintiff. *Delaware State College v. Ricks* (1980) 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431. Plaintiff received notice of the decision to terminate no earlier than July 15, 2004; therefore the section 1983 claim based on the termination is not time barred (July 15, 2006 was a Saturday). After hearing on the motion to dismiss, defendants filed a notice conceding that claims arising out of the termination are not barred by the statute of limitations.

With respect to the state claim predicated on the WPA, defendants correctly contend that plaintiff was obligated to seek a writ of mandamus in state court to overturn the administrative decisions that adversely decided his grievance.*Campbell v. Regents of the University of California,* 35 Cal.4th 311, 320-24, 25 Cal.Rptr.3d 320, 106 P.3d 976,*cert. denied,*546 U.S. 938, 126 S.Ct. 428, 163 L.Ed.2d 326 (2005); *see also Ohton v. Board of Trustees of California State University,* 148 Cal.App.4th 749, 769, 56 Cal.Rptr.3d 111 (2007) (judicial exhaustion required for claims under the WPA). The whistleblower claim was decided against plaintiff in the grievance proceedings at three levels of administrative appeal, which included fact finding and investigation of the facts underlying plaintiff's claims. Plaintiff did not seek a writ of administrative mandamus under California Code of Civil Procedure § 1094.5 and, accordingly, failed to judicially exhaust this claim. As such, plaintiff cannot proceed here in federal court on his state law claim.

**\*2** The only remaining claim that is neither time barred nor barred under the doctrine of judicial exhaustion is the section 1983 claim predicated on the termination that plaintiff alleges was in retaliation for exercising his First Amendment rights. That claim also should be dismissed. While there is no requirement of administrative exhaustion for this claim, the decisions rendered in quasi-judicial administrative proceedings such as were conducted in

this case, and which are final and binding on plaintiff, are entitled to res judicata with respect to claims made under section 1983 and cannot be relitigated here. *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986); *see also Miller v. County of Santa Cruz,* 39 F.3d 1030, 1033 (9th Cir.1994).

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion to dismiss be granted; and

2. This action be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within ten days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

E.D.Cal.,2007.
Nguyen v. University of California
Slip Copy, 2007 WL 2993276 (E.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 7

Westlaw.

2004 WL 3177901 (DOL WAGE-HOUR)

Wage and Hour Division
United States Department of Labor

Opinion Letter
Fair Labor Standards Act (FLSA)

October 6, 2004

***

This is in response to your question regarding the application of the Fair Labor
Standards Act (FLSA) to the vacation policy of one of your clients. Under your
client's plan, employees earn paid vacation hours each pay period. The longer the
employee works for the firm, the more vacation hours are earned. The employer per-
mits employees to take up to two weeks of advanced vacation prior to accruing va-
cation hours. An employee who takes vacation prior to accrual incurs a negative
leave balance that is reduced as the employee continues to accrue vacation. If the
employee leaves the company before he or she has accrued sufficient vacation time
to correct this negative leave balance, your client deducts the amount of the un-
earned vacation time from the employee's final paycheck. You ask whether this is
permissible if the deduction reduces the employee's rate of pay below the minimum
wage in the final paycheck.

You have identified two sources that you are concerned appear to provide conflict-
ing advice on such a situation. The Wage and Hour Division (WHD) Opinion Letter
No. 834 (10/11/84) that you cite states, in part, that "[i]t has been our long-
standing position that where an employer makes a loan or an advance of wages to an
employee, the principal may be deducted from the employee's earnings even if such
deduction cuts into the minimum wage or overtime pay due the employee under the
FLSA."

You also cite the BNA Wage and Hour Manual at 91:512, which deems improper employ-
er attempts to deduct money for losses, such as damage to employer equipment.
This, however, may be viewed more properly as an employer expense of doing busi-
ness, not as a bona fide employee loan.

The position expressed in the WHD Opinion Letter may be applied to your client's
situation. Employees have presumably been informed in advance of the unearned va-
cation time policy: the employer will deduct from their pay the cost of such vaca-
tion time if they leave the company prior to earning sufficient vacation time to
eliminate the vacation deficit. If this is the case, the amount of wages advanced

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as paid vacation time falls into the same category as a bona fide loan or cash ad-
vance to which the employee has voluntarily agreed. As such, the employer may de-
duct the amount advanced for the vacation hours from the employee's final
paycheck, regardless of whether overtime hours were worked in the final week or
whether the deduction brings the employee's pay below the applicable minimum wage.
See Field Operations Handbook ¶30c10; opinion letters dated March 20, 1998 and
November 16, 1977 (enclosed). The employer may not, however, make any assessment
for administrative costs or charge any interest payment that brings the employee
below the minimum wage. Moreover, the hourly rate of pay deducted from the final
paycheck must be the rate the employee was paid at the time of the advanced paid
vacation, rather than a higher rate of pay the employee may earn at the time he or
she leaves employment with your client. Please be aware, however, that although
such a deduction may be permissible under the FLSA, there may be state statutes
under which such a deduction would not be permitted.

This opinion is based exclusively on the facts and circumstances described in your
request and is given on the basis of your representation, explicit or implied,
that you have provided a full and fair description of all the facts and circum-
stances which would be pertinent to our consideration of the question presented.
Existence of any other factual or historical background not contained in your re-
quest might require a different conclusion than the one expressed herein. You have
represented that this opinion is not sought by a party to pending private litiga-
tion concerning the issue addressed herein. You have also represented that this
opinion is not sought in connection with an investigation or litigation between a
client or firm and the Wage and Hour Division or the Department of Labor.

We trust that the above information is responsive to your inquiry.

Sincerely,
Barbara R. Relerford
Office of Enforcement Policy
Fair Labor Standards Team

Enclosures

2004 WL 3177901 (DOL WAGE-HOUR)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab 8

# CITY AND COUNTY OF
# SAN FRANCISCO
# MUNICIPAL CODE

---

# ADMINISTRATIVE CODE

---

# VOLUME II

---

THELEN REID & PRIEST LLP

SEP 2 9 2006

101 SECOND STREET SUITE 1800
SAN FRANCISCO CA 94105-3606





MUNICIPAL CODE CORPORATION

Tallahassee, Florida            2006

# CHAPTER 12W: SICK LEAVE*

Sec. 12W.1.   Title.
Sec. 12W.2.   Definitions.
Sec. 12W.3.   Accrual of Paid Sick Leave.
Sec. 12W.4.   Use of Paid Sick Leave.
Sec. 12W.5.   Notice and Posting.
Sec. 12W.6.   Employer Records.
Sec. 12W.7.   Exercise of Rights Protected; Retaliation Prohibited.
Sec. 12W.8.   Implementation and Enforcement.
Sec. 12W.9.   Waiver Through Collective Bargaining.
Sec. 12W.10.  Other Legal Requirements.
Sec. 12W.11.  More Generous Employer Leave Policies.
Sec. 12W.12.  Operative Date.
Sec. 12W.13.  Preemption.
Sec. 12W.14.  City Undertaking Limited to Promotion of the General Welfare.
Sec. 12W.15.  Severability.
Sec. 12W.16.  Amendment by the Board of Supervisors.

## SEC. 12W.1.  TITLE.

This Chapter shall be known as the "Sick Leave Ordinance." (Added by Proposition F, 11/7/2006)

## SEC. 12W.2.  DEFINITIONS.

For purposes of this Chapter, the following definitions apply.

(a) "Agency" shall mean the Office of Labor Standards Enforcement or any department or office that by ordinance or resolution is designated the successor to the Office of Labor Standards Enforcement.

(b) "City" shall mean the City and County of San Francisco.

(c) "Employee" shall mean any person who is employed within the geographic boundaries of the City by an employer, including part-time and temporary employees. "Employee" includes a participant in a Welfare-to-Work Program when the participant is engaged in work activity that would be considered "employment" under the federal Fair Labor Standards Act, 29 U.S.C. §201 et seq., and any applicable U.S. Department of Labor Guidelines. "Welfare-to-Work Program" shall include any public assistance program administered by the Human Services Agency, including but not limited to CalWORKS and the County Adult Assistance Program (CAAP), and any successor programs that are substantially similar to them, that require a public assistance applicant or recipient to work in exchange for their grant.

(d) "Employer" shall mean any person, as defined in Section 18 of the California Labor Code, including corporate officers or executives, who directly or indirectly or through an agent or any other person, including through the services of a temporary services or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of an employee.

(e) "Paid sick leave" shall mean paid "sick leave" as defined in California Labor Code § 233(b)(4), except that the definition extends beyond the employee's own illness, injury, medical condition, need for medical diagnosis or treatment, or medical reason, to also encompass time taken off work by an employee for the purpose of providing care or assistance to other persons, as specified further in Section 12W.4(a), with an

*Editor's Note:*

*Proposition F, approved November 7, 2006, added provisions designated as a new Ch. 12W, Sick Leave, to read as herein set out. At the request of the city, former Ch. 12W, pertaining to the San Francisco Slavery Disclosure Ordinance, has been renumbered as Ch. 12Y.*

illness, injury, medical condition, need for medical diagnosis or treatment, or other medical reason.

(f) "Small business" shall mean an employer for which fewer than ten persons work for compensation during a given week. In determining the number of persons performing work for an employer during a given week, all persons performing work for compensation on a full-time, part-time, or temporary basis shall be counted, including persons made available to work through the services of a temporary services or staffing agency or similar entity. (Added by Proposition F, 11/7/2006)

### SEC. 12W.3. ACCRUAL OF PAID SICK LEAVE.

(a) For employees working for an employer on or before the operative date of this Chapter, paid sick leave shall begin to accrue as of the operative date of this Chapter. For employees hired by an employer after the operative date of this Chapter, paid sick leave shall begin to accrue 90 days after the commencement of employment with the employer.

(b) For every 30 hours worked after paid sick leave begins to accrue for an employee, the employee shall accrue one hour of paid sick leave. Paid sick leave shall accrue only in hour-unit increments; there shall be no accrual of a fraction of an hour of paid sick leave.

(c) For employees of small businesses, there shall be a cap of 40 hours of accrued paid sick leave. For employees of other employers, there shall be a cap of 72 hours of accrued paid sick leave. Accrued paid sick leave for employees carries over from year to year (whether calendar year or fiscal year), but is limited to the aforementioned caps.

(d) If an employer has a paid leave policy, such as a paid time off policy, that makes available to employees an amount of paid leave that may be used for the same purposes as paid sick leave under this Chapter and that is sufficient to meet the requirements for accrued paid sick

leave as stated in subsections (a)-(c), the employer is not required to provide additional paid sick leave.

(e) An employer is not required to provide financial or other reimbursement to an employee upon the employee's termination, resignation, retirement, or other separation from employment, for accrued paid sick leave that the employee has not used. (Added by Proposition F, 11/7/2006)

### SEC. 12W.4. USE OF PAID SICK LEAVE.

(a) An employee may use paid sick leave not only when he or she is ill or injured or for the purpose of the employee's receiving medical care, treatment, or diagnosis, as specified more fully in California Labor Code § 233(b)(4), but also to aid or care for the following persons when they are ill or injured or receiving medical care, treatment, or diagnosis: Child; parent; legal guardian or ward; sibling; grandparent; grandchild; and spouse, registered domestic partner under any state or local law, or designated person. The employee may use all or any percentage of his or her paid sick leave to aid or care for the aforementioned persons. The aforementioned child, parent, sibling, grandparent, and grandchild relationships include not only biological relationships but also relationships resulting from adoption; step-relationships; and foster care relationships. "Child" includes a child of a domestic partner and a child of a person standing in loco parentis.

If the employee has no spouse or registered domestic partner, the employee may designate one person as to whom the employee may use paid sick leave to aid or care for the person. The opportunity to make such a designation shall be extended to the employee no later than the date on which the employee has worked 30 hours after paid sick leave begins to accrue pursuant to Section 12W.3(a). There shall be a window of 10 work days for the employee to make this designation. Thereafter, the opportunity to make such a designation, including the opportunity to change such a designation previously made, shall be

extended to the employee on an annual basis, with a window of 10 work days for the employee to make the designation.

(b) An employer may not require, as a condition of an employee's taking paid sick leave, that the employee search for or find a replacement worker to cover the hours during which the employee is on paid sick leave.

(c) An employer may require employees to give reasonable notification of an absence from work for which paid sick leave is or will be used.

(d) An employer may only take reasonable measures to verify or document that an employee's use of paid sick leave is lawful. (Added by Proposition F, 11/7/2006)

### SEC. 12W.5. NOTICE AND POSTING.

(a) The Agency shall, by the operative date of this Chapter, publish and make available to employers, in all languages spoken by more than 5% of the San Francisco workforce, a notice suitable for posting by employers in the workplace informing employees of their rights under this Chapter. The Agency shall update this notice on December 1 of any year in which there is a change in the languages spoken by more than 5% of the San Francisco workforce. In its discretion, the Agency may combine the notice required herein with the notice required by Section 12R.5(a) of the Administrative Code.

(b) Every employer shall post in a conspicuous place at any workplace or job site where any employee works the notice required by subsection (a). Every employer shall post this notice in English, Spanish, Chinese, and any language spoken by at least 5% of the employees at the workplace or job site. (Added by Proposition F, 11/7/2006)

### SEC. 12W.6. EMPLOYER RECORDS.

Employers shall retain records documenting hours worked by employees and paid sick leave taken by employees, for a period of four years, and shall allow the Agency access to such records, with appropriate notice and at a mutually agreeable time, to monitor compliance with the requirements of this Chapter. When an issue arises as to an employee's entitlement to paid sick leave under this Chapter, if the employer does not maintain or retain adequate records documenting hours worked by the employee and paid sick leave taken by the employee, or does not allow the Agency reasonable access to such records, it shall be presumed that the employer has violated this Chapter, absent clear and convincing evidence otherwise. (Added by Proposition F, 11/7/2006)

### SEC. 12W.7. EXERCISE OF RIGHTS PROTECTED; RETALIATION PROHIBITED.

It shall be unlawful for an employer or any other person to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right protected under this Chapter.

It shall be unlawful for an employer or any other person to discharge, threaten to discharge, demote, suspend, or in any manner discriminate or take adverse action against any person in retaliation for exercising rights protected under this Chapter. Such rights include but are not limited to the right to use paid sick leave pursuant to this Chapter; the right to file a complaint or inform any person about any employer's alleged violation of this Chapter; the right to cooperate with the Agency in its investigations of alleged violations of this Chapter; and the right to inform any person of his or her potential rights under this Chapter.

It shall be unlawful for an employer absence control policy to count paid sick leave taken under this Chapter as an absence that may lead to or result in discipline, discharge, demotion, suspension, or any other adverse action.

Protections of this Chapter shall apply to any person who mistakenly but in good faith alleges violations of this Chapter.

Taking adverse action against a person within 90 days of the person's filing a complaint with the Agency or a court alleging a violation of any provision of this Chapter; informing any person about an employer's alleged violation of this Chapter; cooperating with the Agency or other persons in the investigation or prosecution of

any alleged violation of this Chapter; opposing any policy, practice, or act that is unlawful under this Chapter; or informing any person of his or her rights under this Chapter shall raise a rebuttable presumption that such adverse action was taken in retaliation for the exercise of one or more of the aforementioned rights. (Added by Proposition F, 11/7/2006)

## SEC. 12W.8. IMPLEMENTATION AND ENFORCEMENT.

(a) **Implementation.** The Agency shall be authorized to coordinate implementation and enforcement of this Chapter and may promulgate appropriate guidelines or rules for such purposes. Any guidelines or rules promulgated by the Agency shall have the force and effect of law and may be relied on by employers, employees, and other persons to determine their rights and responsibilities under this Chapter. Any guidelines or rules may establish procedures for ensuring fair, efficient, and cost-effective implementation of this Chapter, including supplementary procedures for helping to inform employees of their rights under this Chapter, for monitoring employer compliance with this Chapter, and for providing administrative hearings to determine whether an employer or other person has violated the requirements of this Chapter.

(b) **Administrative Enforcement.** The Agency is authorized to take appropriate steps to enforce this Chapter. The Agency may investigate any possible violations of this Chapter by an employer or other person. Where the Agency has reason to believe that a violation has occurred, it may order any appropriate temporary or interim relief to mitigate the violation or maintain the status quo pending completion of a full investigation or hearing.

Where the Agency, after a hearing that affords a suspected violator due process, determines that a violation has occurred, it may order any appropriate relief including, but not limited to, reinstatement, back pay, the payment of any sick leave unlawfully withheld, and the payment of an additional sum as an administrative penalty to each employee or person whose rights under this Chapter were violated. If any paid

sick leave was unlawfully withheld, the dollar amount of paid sick leave withheld from the employee multiplied by three, or $250.00, whichever amount is greater, shall be included in the administrative penalty paid to the employee. In addition, if a violation of this Chapter resulted in other harm to the employee or any other person, such as discharge from employment, or otherwise violated the rights of employees or other persons, such as a failure to post the notice required by Section 12W.5(b), or an act of retaliation prohibited by Section 12W.7, this administrative penalty shall also include $50.00 to each employee or person whose rights under this Chapter were violated for each day or portion thereof that the violation occurred or continued.

Where prompt compliance is not forthcoming, the Agency may take any appropriate enforcement action to secure compliance, including initiating a civil action pursuant to Section 12W.8(c) and/or, except where prohibited by State or Federal law, requesting that City agencies or departments revoke or suspend any registration certificates, permits or licenses held or requested by the employer or person until such time as the violation is remedied. In order to compensate the City for the costs of investigating and remedying the violation, the Agency may also order the violating employer or person to pay to the City a sum of not more than $50.00 for each day or portion thereof and for each employee or person as to whom the violation occurred or continued. Such funds shall be allocated to the agency and used to offset the costs of implementing and enforcing this Chapter.

An employee or other person may report to the agency any suspected violation of this Chapter. The Agency shall encourage reporting pursuant to this subsection by keeping confidential, to the maximum extent permitted by applicable laws, the name and other identifying information of the employee or person reporting the violation. Provided, however, that with the authorization of such person, the Agency may disclose his or her name and identifying information as necessary to enforce this Chapter or for other appropriate purposes.

(c) **Civil Enforcement.** The Agency, the City Attorney, any person aggrieved by a violation of this Chapter, any entity a member of which is aggrieved by a violation of this Chapter, or any other person or entity acting on behalf of the public as provided for under applicable State law, may bring a civil action in a court of competent jurisdiction against the employer or other person violating this Chapter and, upon prevailing, shall be entitled to such legal or equitable relief as may be appropriate to remedy the violation including, but not limited to, reinstatement, back pay, the payment of any sick leave unlawfully withheld, the payment of an additional sum as liquidated damages in the amount of $50.00 to each employee or person whose rights under this Chapter were violated for each hour or portion thereof that the violation occurred or continued, plus, where the employer has unlawfully withheld paid sick leave to an employee, the dollar amount of paid sick leave withheld from the employee multiplied by three; or $250.00, whichever amount is greater; and reinstatement in employment and/or injunctive relief; and, further, shall be awarded reasonable attorneys' fees and costs. Provided, however, that any person or entity enforcing this Chapter on behalf of the public as provided for under applicable State law shall, upon prevailing, be entitled only to equitable, injunctive or restitutionary relief, and reasonable attorneys' fees and costs.

(d) **Interest.** In any administrative or civil action brought under this Chapter, the Agency or court, as the case may be, shall award interest on all amounts due and unpaid at the rate of interest specified in subdivision (b) of Section 3289 of the California Civil Code.

(e) **Remedies Cumulative.** The remedies, penalties, and procedures provided under this Chapter are cumulative. (Added by Proposition F, 11/7/2006)

### SEC. 12W.9.  WAIVER THROUGH COLLECTIVE BARGAINING.

All or any portion of the applicable requirements of this Chapter shall not apply to employees covered by a bona fide collective bargaining agreement to the extent that such requirements are expressly waived in the collective bargaining agreement in clear and unambiguous terms. (Added by Proposition F, 11/7/2006)

### SEC. 12W.10.  OTHER LEGAL REQUIREMENTS.

This Chapter provides minimum requirements pertaining to paid sick leave and shall not be construed to preempt, limit, or otherwise affect the applicability of any other law, regulation, requirement, policy, or standard that provides for greater accrual or use by employees of sick leave, whether paid or unpaid, or that extends other protections to employees. (Added by Proposition F, 11/7/2006)

### SEC. 12W.11.  MORE GENEROUS EMPLOYER LEAVE POLICIES.

This Chapter provides minimum requirements pertaining to paid sick leave and shall not be construed to prevent employers from adopting or retaining leave policies that are more generous than policies that comply with this Chapter. Employers are encouraged to provide more generous leave policies than required by this Chapter. (Added by Proposition F, 11/7/2006)

### SEC. 12W.12.  OPERATIVE DATE.

This Chapter shall become operative 90 days after its adoption by the voters at the November 7, 2006 election. This Chapter shall have prospective effect only. (Added by Proposition F, 11/7/2006)

### SEC. 12W.13.  PREEMPTION.

Nothing in this Chapter shall be interpreted or applied so as to create any power or duty in conflict with federal or state law. (Added by Proposition F, 11/7/2006)

### SEC. 12W.14.  CITY UNDERTAKING LIMITED TO PROMOTION OF GENERAL WELFARE.

In undertaking the adoption and enforcement of this Chapter, the City is undertaking only to promote the general welfare. The City is not assuming, nor is it imposing on its officers

and employees, an obligation for breach of which it is liable in money damages to any person who claims that such breach proximately caused injury. This Chapter does not create a legally enforceable right by any member of the public against the City. (Added by Proposition F, 11/7/2006)

### SEC. 12W.15.  SEVERABILITY.

If any part or provision of this Chapter, or the application of this Chapter to any person or circumstance, is held invalid, the remainder of this Chapter, including the application of such part or provision to other persons or circumstances, shall not be affected by such a holding and shall continue in full force and effect. To this end, the provisions of this Chapter are severable. (Added by Proposition F, 11/7/2006)

### SEC. 12W.16.  AMENDMENT BY THE BOARD OF SUPERVISORS.

The Board of Supervisors may amend this Chapter with respect to matters relating to its implementation and enforcement (including but not limited to those matters addressed in Section 12W.8) and matters relating to employer requirements for verification or documentation of an employee's use of sick leave, but not with respect to this Chapter's substantive requirements or scope of coverage; provided, however, that, in the event any provision in this Chapter is held legally invalid, the Board retains the power to adopt legislation concerning the subject matter that was covered in the invalid provision. (Added by Proposition F, 11/7/2006)

Tab 9

**CITY AND COUNTY OF SAN FRANCISCO**                                    **GAVIN NEWSOM, MAYOR**

**DEPARTMENT OF ADMINISTRATIVE SERVICES**
**OFFICE OF LABOR STANDARDS ENFORCEMENT**
**DONNA LEVITT, MANAGER**



## *San Francisco Paid Sick Leave Ordinance*
## *Administrative Code Chapter 12W*

### Frequently Asked Questions
### *First Posted 1/29/07*
### *Most Recently Updated 9/28/07*

### Effective Date

1.  **Q: When does the Ordinance take effect?**

    A: The Paid Sick Leave Ordinance takes effect on February 5, 2007.

### Scope of Ordinance

2.  **Q: If an employer is based outside of San Francisco but has employees who perform work in the city, do the employees accrue paid sick leave for hours worked in San Francisco?**

    A: Yes. All employees who perform work in San Francisco, including on a part-time or temporary basis, accrue paid sick leave for those hours worked in the city, regardless of where their employer is located. However:
    - Employees in San Francisco solely to attend or present at a convention or conference are not covered by the Ordinance if they participate in San Francisco conventions or conferences for fewer than 56 hours within a calendar year; and,
    - Employees who perform work in San Francisco on an occasional basis are covered by the Ordinance only if they perform 56 or more hours of work in San Francisco within a calendar year.

    **For specific rules governing limited and alternative San Francisco work schedules, see Rule Number 6.**

3.  **Q: Do employees accrue paid sick leave for hours worked outside of the city?**

    A: No. Under the Ordinance, employees accrue paid sick leave only for those hours worked within San Francisco.

4.  **Q: In determining whether or not an employer qualifies as a Small Business under the Ordinance, are all of its employees counted, including those who work outside of San Francisco?**

A: Yes. For the purpose of calculating employer size, all persons performing work for the employer during a given week are counted, whether or not the persons work in San Francisco.

5. **Q: If an employer operates three stores, each with seven employees, is it considered a Small Business under the Ordinance?**

A: No. For the purpose of calculating employer size, employees performing work in different locations operated by the same employer are all counted as employees of the employer. The seven employees at each of the three stores would be considered together, totaling 21 employees for this employer. The employer would not be considered as a Small Business under the Ordinance.

6. **Q: How does an employer determine whether it qualifies as a Small Business if its number of employees changes during the year?**

A: A Small Business is an employer for which fewer than 10 persons, including part-time and temporary employees, work for compensation during a given week. In situations in which the number of persons who work for compensation per week fluctuates above and below 10 or more per week over the course of a year, OLSE will calculate business size for the current calendar year based upon the average number of persons who worked for compensation per week during the preceding calendar year.

For example, for a business that operated the entire preceding year, the calculation would be as follows: (a) For each of the 52 weeks during the year, determine the total number of persons who worked for compensation; (b) Add these numbers together; (c) Divide by 52. If this number is below 10, then the employer would qualify as a Small Business for the current calendar year.

For new employers, OLSE will calculate business size for the current calendar year based upon the average number of persons per week who worked for compensation for the first ninety days after its first employee(s) began work.

**For specific rules governing Small Business definition and fluctuating business size, see <u>Rule Number 7</u>.**

7. **Q: Does the Ordinance cover undocumented employees?**

A: Yes. All employees who work in San Francisco – whether or not they are legally authorized to work in the United States – are covered by the law. OLSE will process an employee's claim without regard to his or her immigration status. Employees filing a claim with OLSE will not be questioned about their immigration status.

8. **Q: Does the Ordinance require employers to provide paid sick leave to independent contractors?**

A: No. The Ordinance applies to employees. However, merely labeling someone as an "independent contractor" does not make it so. Consistent with California law, whether a person is an employee or independent contractor is a fact-specific inquiry that is determined by a variety of factors.

For more information on how the State of California reviews issues relating to independent contractor status in wage and hour cases, see the California Division of Labor Standards Enforcement webpage Independent Contractor versus Employee.

9.  Q: **Are household employees, such as caregivers, cooks, and house cleaners, covered by the Ordinance?**

A: Yes. Household employees who perform work in San Francisco are covered by the Ordinance. Note that household workers who are properly classified as independent contractors are not covered by the Ordinance.

10. Q: **If a business contracts with a temporary staffing agency to have the agency provide temporary employees to the business, who is responsible under the Ordinance to meet the obligations to the employees?**

A: Both the business and the temporary staffing agency may be considered an Employer under the Ordinance and have an obligation to ensure that the requirements are met. The business and the temporary staffing agency may agree between themselves who will monitor compliance with the Ordinance, but any such assignment of responsibility cannot limit or deny the rights of temporary employees under the Ordinance.

11. Q: **Assume an employee has worked for various businesses through a temporary staffing agency and has accrued 32 hours of paid sick leave. However, the employee has only worked for one week at his or her current assignment. Is the employee entitled to use paid sick leave?**

A: Based on the limited facts presented here, yes. The temporary staffing agency has the responsibility for providing paid sick leave since the employee has worked for it for more than 90 days and accrued paid sick leave. The business has no obligation to pay the employee sick leave because the employee has not worked for it for at least 90 days and accrued paid sick leave in that assignment.

12. Q: **Can an employer require employees to use paid sick leave while on family medical leave under state or federal law?**

A: This question involves the interpretation of the Family Medical Leave Act (FMLA) and the California Family Rights Act (CFRA). OLSE has no jurisdiction over enforcement of either the FMLA or the CFRA. OLSE recommends that employers and employees consult with the Federal Department of Labor regarding FMLA issues and with the California Department of Fair Employment and Housing regarding CFRA issues. In addition, employers and employees may wish to review administrative regulations

3

implementing the FMLA (29 Code of Federal Regulations, Section 825.207) and CFRA (California Administrative Code, Title 2, Section 7297.5)

**13. Q: Can an employee who is receiving paid sick leave also get State Disability Insurance (SDI) or Workers' Compensation (WC) benefits?**

A: It is possible for an employee who is receiving paid sick leave to be eligible for SDI and WC benefits at the same time; in fact, such employees may find it helpful to integrate these benefits with paid sick leave in order to receive their full (or regular) pay during periods of temporary disability. However, whether an employee is eligible for SDI or WC benefits is governed by the California Unemployment Insurance and Labor Codes, which also provide guidance about the integration of paid sick leave and other benefits. For more information about SDI benefits, consult the Employment Development Department. For more information about Workers' Compensation benefits, consult the Division of Compensation.

**14. Q: Are employees of private sector employers at the San Francisco International Airport covered by the Ordinance?**

A: No. The Ordinance covers employees who are employed within the geographic boundaries of San Francisco, which does not include the San Francisco International Airport (SFO).

Note that many private sector employers at SFO are covered by the City's Minimum Compensation Ordinance which provides for paid time off that may be used for sick leave, vacation, or personal necessity. For more information on the Minimum Compensation Ordinance, call (415) 554-6237 or email MCO@sfgov.org.

## Accrual of Paid Sick Leave

**15. Q: When do employees begin to accrue paid sick leave?**

A: For employees working for an employer on or before February 5, 2007, paid sick leave begins to accrue on that date. For employees hired by an employer after February 5, 2007, paid sick leave begins to accrue 90 calendar days after the employee's first day of work.

**For specific rules governing breaks-in-service, see Rule Number 4.**

**16. Q: Does an employee need to work his or her 90 calendar day eligibility period in San Francisco?**

A: No. Employees begin to accrue paid sick leave on work performed in San Francisco 90 calendar days after their first day of work for an employer, irrespective of where the employees worked for the employer during their eligibility period.

4

**17. Q: At what rate do employees accrue paid sick leave?**

A: For every 30 hours worked, an employee accrues one hour of paid sick leave.

**18. Q: What constitutes "hours worked" under the Ordinance?[1]**

A: OLSE defines "hours worked" in a manner consistent with the California Division of Labor Standards Enforcement's _Enforcement Policies and Interpretations Manual_ Section 46. Topics include travel time, meal periods, and reporting time.

Note that while Reporting Time is not considered "hours worked" for purposes of calculating overtime, it is compensable time and, thus, must be included in calculating sick leave accrual.

**19. Q: Does paid sick leave accrue on overtime hours worked?**

A: It depends on the employee's status under the federal Fair Labor Standards Act (FLSA) and California labor law. For employees who are not exempt from the overtime provisions of the FLSA and California labor law, paid sick leave accrues on all hours worked, including overtime hours worked.

For employees who are exempt from the overtime provisions of the FLSA and California labor law (an Exempt Employee), paid sick leave accrues based upon a 40-hour work week absent evidence that the Exempt Employee's regular work week is less than 40 hours. In instances where there is evidence that the Exempt Employee's regular work week is less than 40 hours, paid sick leave accrues based upon that regular work week.

**For specific rules governing the accrual of paid sick leave for exempt employees, see Rule Number 8.**

**20. Q: Does paid sick leave accrue when employees are on vacation or out sick?**

A: No. Paid sick leave does not accrue when employees are not working, such as when they are out on vacation or out sick.

**21. Q: Do employees accrue 1 1/3 hours of paid sick leave for a 40-hour work week?**

A: No. Paid sick leave accrues only in hour-unit increments, not in fractions of an hour. Assuming a 40-hour work week, for their first week of work after employees begin to accrue paid sick leave, they accrue one hour of paid sick leave, and have worked 10 of the 30 hours needed to accrue their second hour of paid sick leave. After employees work 20 additional hours (for 60 total hours worked since beginning to accrue paid sick leave), they will have accrued two hours of paid sick leave.

---

[1] Added 9/28/2007

**22. Q: Do employees lose accrued paid sick leave hours at the end of the year?**

A: No. Unused hours of paid sick leave that employees have accrued do not expire at the end of the year.

**23. Q: Is there a cap on how much paid sick leave an employee can accrue?**

A: Yes. For employees of Small Businesses (ones for which fewer than 10 persons, including part-time and temporary employees, work for compensation during a given week), there is a cap of 40 hours of accrued paid sick leave. For employees of other employers, there is a cap of 72 hours of accrued paid sick leave.

**24. Q: Is the cap on paid sick leave an annual cap?**

A: No. The Ordinance sets a cap on how many hours of paid sick leave an employee may have "in the bank" at any given time. It does not limit how many hours of paid sick leave an employee may accrue or use in a year.

For example, John works for a Small Business. From January through July, John accrues 40 hours of paid sick leave. As an employee of a Small Business, that is his cap. In August, John falls ill and uses all 40 hours of paid sick leave that he has "in the bank". When John comes back to work, he begins to accrue new hours of paid sick leave. Over his next three months of work, John accrues 16 new hours of paid sick leave. In November, he falls ill again and uses those 16 hours of paid sick leave that he now has "in the bank". In all, John accrued and used 56 hours of paid sick leave so far that year.

**25. Q: Once employees hit their cap of paid sick leave, do they get credit for additional hours worked?**

A: No. Once employees hit their cap of paid sick leave, they no longer accrue paid sick leave until they use some of the hours they have "in the bank".

For example, Jane works for a Small Business. From January through July, Jane accrues 40 hours of paid sick leave. As an employee of a Small Business, that is her cap. She continues to work, without using any of the paid sick leave that she has accrued, for the next two years. At that point, she still has only 40 hours of paid sick leave "in the bank". Jane then falls ill and uses 8 hours of her paid sick leave. She now has 32 hours of paid sick leave left. When she returns to work, she will begin to accrue new hours of paid sick leave back up to her cap.

**26. Q: Does the Ordinance require employers to provide 72 hours of paid sick leave per year (40 hours of paid sick leave per year for Small Businesses)?**

A: No. Under the Ordinance, employees accrue one hour of paid sick leave for every 30 hours worked. The number of hours of paid sick leave that an employee earns is based

6

upon how many hours the employee works.

**27. Q:** **If a large employer offers its employees 72 hours of paid sick leave per year, is this policy sufficient to meet the requirements of the Ordinance?**

   **A:** Not necessarily. It depends on the facts of the situation. While the law caps at 72 hours the amount of paid sick leave an employee of a large employer may accrue, accrued paid sick leave hours do not expire at the end of the year – and there is no cap on the number of hours of paid sick leave that an employee may use in a given year.

     As an example, David accrues 72 hours of paid sick leave in year 1. In January of year 2, he falls ill and uses all of those hours at that time. David comes back to work and over the next nine months accrues 48 new hours of paid sick leave. Then, in November, he falls ill again and uses those 48 hours of paid sick leave. In total, under this scenario, David has used 120 hours of paid sick leave in year 2. Under this scenario, a policy that only permits employees to use 72 hours of paid sick leave per year would be insufficient to meet the requirements of the law.

**28. Q:** **If an employer offers Paid Time Off (PTO) or vacation days that may be used for any purpose, including sick leave, beyond the minimum accrual requirements in the Ordinance, does the employer need to offer additional paid sick leave?**

   **A:** No. If an employer has a paid leave policy, such as a PTO or vacation policy, that makes available to employees paid leave that may be used for the same purposes specified in the Ordinance (or for any purpose) and that is sufficient to meet the Ordinance's requirements for paid sick leave accrual, then it is not required to provide additional paid sick leave.

     OLSE recommends that employers who implement a policy that requires employees to use PTO or vacation time when they are sick inform their employees of that requirement prior to the employees' requested use of paid leave.

**29. Q:** **Assume that when the Ordinance becomes effective on February 5, 2007, a Small Business would like to credit its full-time employees with 40 hours of Paid Time Off, which may be used for any purpose including sick leave. If one of its employees uses 40 hours for a vacation in March, and then falls ill in September, does the employer need to provide additional hours of paid sick leave?**

   **A:** Not necessarily. The employee would be entitled to additional paid leave only at the point at which the employee has worked enough hours to accrue new paid sick leave beyond what was credited by the employer as PTO.

     In this example, the employee would have to work 1,200 hours from February 5 to September before he or she would have accrued the 40 hours of paid leave (40 x 30) that had already been used in March for the vacation. Only after working those 1,200 hours would the employee begin to accrue more paid sick leave hours.

7

**30. Q: Is it acceptable for employers to establish payroll systems under which employees accrue paid sick leave in less than one-hour increments?**

    A: Yes. The Ordinance establishes a minimum standard for computing accrual of paid sick leave – one-hour increments. The Ordinance does not bar an employer from having a system or policy that accrues paid sick leave in smaller amounts, so long as the system or policy does not fall below the standard set by the Ordinance.

**31. Q: Are employers required to pay employees for unused paid sick leave when the employees quit, retire, or are fired?**

    A: No. The Ordinance does not require an employer to pay employees for accrued unused paid sick leave upon the employee's termination, resignation, retirement, or other separation from employment. However, if an employer is using a Paid Time Off (PTO) or vacation policy to comply with the Ordinance, employers need to comply with other applicable laws, such as California law, which would require the payout of PTO or vacation upon separation of an employee.

    **For specific rules governing breaks-in-service, see <u>Rule Number 4</u>.**

**32. Q: What constitutes a "separation from employment" under the Ordinance and *Rules Implementing the Paid Sick Leave Ordinance*?[2]**

    A: In determining whether or not there has been a "separation from employment" under the Ordinance and *Rules*, OLSE will consider all relevant circumstances including, but not limited to, whether an employer has demonstrated compliance with provisions of the <u>California Labor Code</u> and <u>California Unemployment Insurance Code</u> that require, respectively, immediate payment of final wages and written notice as to change in employment relationship.


## <u>Use of Paid Sick Leave</u>

**33. Q: For what purposes can employees use paid sick leave?**

    A: Employee may use paid sick leave not only when they are ill, injured, or for the purpose of receiving medical care, treatment, or diagnosis, but also to aid or care for a Family Member or Designated Person when those persons are ill, injured, or receiving medical care, treatment, or diagnosis.

**34. Q: Does the Ordinance require employers to permit employees to use paid sick leave when they are working or scheduled to work outside of San Francisco?**

_____

[2] Added 9/28/2007

A: No. The Ordinance requires employers to allow employees to use paid sick leave when they are working or scheduled to work in San Francisco. However, an employer may choose to permit employees to use paid sick leave when the employees are working or scheduled to work outside of San Francisco.

**35. Q: If an employee is transferred to work outside of San Francisco, what happens to the employee's accrued paid sick leave hours?**

A: Employers may allow employees to use paid sick leave hours outside of San Francisco. However, if the employer does not allow the use of paid sick leave hours outside of San Francisco, those hours remain "in the bank" for four years from the employee's last day of work in San Francisco, available for use should the employee work or be scheduled to work in San Francisco during that time.

**36. Q: Who qualifies as a Family Member under the Ordinance?**

A: Family Member under the Ordinance is defined as a: child; parent; legal guardian or ward; sibling; grandparent; grandchild; and spouse or registered domestic partner under any state or local law. These relationships include not only biological relationships but also relationships resulting from adoption, step-relationships, and foster care relationships.

**37. Q: What is a Designated Person?**

A: All employees may use paid sick leave when they or a member of their family are ill or injured or for the purpose of receiving medical care, treatment, or diagnosis. In addition, if an employee has no spouse or registered domestic partner, the employee may designate one person for whom s/he may use paid sick leave to provide aid or care. This designation must be on file with the employer before the employee may use paid sick leave for this purpose, unless the employer has failed to take affirmative steps to offer the employee an opportunity to list a Designated Person.

**38. Q: Do employers have the obligation to take affirmative steps to offer employees without a spouse or registered domestic partner an opportunity to list a Designated Person?**

A: Yes. If an employer fails to provide an employee without a spouse or domestic partner the opportunity to list a Designated Person and the employee requests use of paid sick leave to care for a non-Family Member, the employer must permit the employee to select a Designated Person and to take paid sick leave for that person at that time. That Designated Person will remain on file until the next opportunity for the employee to change his or her designation.

**39. Q: When do employers need to offer employees without a spouse or domestic partner the opportunity to list a Designated Person?**

A: Employers must offer the opportunity to make a designation no later than 30 work hours after the date paid sick leave begins to accrue. As noted above, for employees working for an employer on or before February 5, 2007, paid sick leave begins to accrue on that date. Therefore, employers must offer the opportunity for those employees to make a designation within 30 San Francisco work hours of February 5, 2007.

For employees hired by an employer after February 5, 2007, paid sick leave begins to accrue 90 calendar days after their first day of work. Employers must offer to these employees the opportunity to make a designation no later than 30 San Francisco work hours after 90 calendar days have elapsed from the first day of work.

**40. Q: Is it acceptable for employers to offer the annual opportunity to list a Designated Person to employees without a spouse or registered domestic partner at the same time, for example during the employer's annual open designation period?**

A: Yes. However, as noted in the preceding Q and A, there are strict time deadlines for the requirement of initially offering employees an opportunity to list a Designated Person.

**41. Q: Is it reasonable to require employees to provide advance notification for every use of paid sick leave?**

A: What is reasonable depends on the specific situation. An employer's policies or practices should not be so onerous that they deter employees from legitimate use of paid sick leave.

**For specific rules governing employee notification of paid sick leave use, see <u>Rule Number 1</u>.**

**42. Q: Is it reasonable to require employees to provide a doctor's note for every use of paid sick leave?**

A: What is reasonable depends on the specific situation. In general, an employer's policy should not be so onerous that it deters employees from legitimate use of paid sick leave.

**For specific rules governing employer verification of paid sick leave use, see <u>Rule Number 2</u>.**

**43. Q: In situations of a pattern or clear instance of paid sick leave abuse, is it reasonable to require a doctor's note or other verification for that employee's use of paid sick leave on those days?**

A: Based on the limited facts presented regarding a pattern of paid sick leave abuse, the requirement appears reasonable. In the case of suspected sick leave abuse, an employer may review sick leave use with heightened scrutiny. Examples of suspected sick leave abuse include but are not limited to: (a) taking paid sick leave on days when an employee's request for vacation leave has been denied; (b) a pattern of taking paid sick

10

leave on days when the employee is scheduled to work a shift that may be perceived as undesirable; and, (c) a pattern of taking paid sick leave on Mondays or Fridays or immediately following a holiday.

**For specific rules governing employer verification of paid sick leave use, see <u>Rule Number 2</u>.**

**44. Q: Are there medical privacy laws that employers must follow when verifying that an employee's use of paid sick leave is consistent with the Ordinance?**

A: Yes. In confirming that an employee's use of paid sick leave is consistent with the Ordinance, employers must abide by all federal, state, and local medical privacy laws. For more information regarding privacy of medical issues in the workplace, contact the <u>Department of Labor</u>, the <u>Department of Health & Human Services</u>, and the <u>Equal Employment Opportunity Commission</u> regarding federal law and the <u>Fair Employment & Housing Commission</u> regarding state law.

**45. Q: Can an employer require its employees to use paid sick leave in one hour increments?**

A: Yes. However, an employer may choose to permit its employees to use paid sick leave in less than one hour increments if the employer wishes to do so.

**For specific rules governing other employer requirements pertaining to amount of paid sick leave taken, see <u>Rule Number 3</u>.**

**46. Q: Can an employer require its employees to take off the full day to use paid sick leave?**

A: What is a reasonable requirement depends on the specific situation. Under the Ordinance, employees may use paid sick leave to receive medical care, treatment, or diagnosis, which may only require limited leave. In most employment situations, a requirement that an employee take off more hours than requested would not be considered reasonable.

**For specific rules governing other employer requirements pertaining to amount of paid sick leave taken, see <u>Rule Number 3</u>.**

**47. Q: How many hours of paid sick leave may an employee use on days when the employee is scheduled to work more than 8 hours (i.e. when the employee is scheduled to work overtime hours)?[3]**

A: An employee may use paid sick leave hours for all hours the employee is scheduled to work, including regular and overtime hours. However, all hours would be paid to the

---

[3] Added 9/28/2007

11

employee at the regular sick leave rate of pay.

**48. Q: When can an on-call employee use paid sick leave under the Ordinance?**

A: An on-call employee may use paid sick leave as permitted under the Ordinance when s/he is at work or scheduled to work. If an employer decides to allow the use of paid sick leave in other circumstances, the employer may do so.

**49. Q: Is paid sick leave to be available to employees as soon as they accrue it, or can an employer make it available at the end of the pay period or some other future point in time?**

A: Paid sick leave is to be available to employees as soon as they accrue it

## Payment of Sick Leave

**NOTES:      In no case may employees be paid sick leave at a rate of pay that is less than the San Francisco minimum wage.**

**For specific rules governing rate of pay for piece rate and commissioned employees, see Rule Number 5.**

**50. Q: What is the sick leave rate of pay for employees who are paid an hourly wage?**

A: The sick leave rate of pay for employees who are paid an hourly wage is the employee's hourly wage.

**51. Q: If an employer provides benefits on an hourly basis, is the employer required to provide the same benefits when its employees are using paid sick leave hours?**

A: Yes.

**52. Q: What is the sick leave rate of pay for employees who are paid an annual salary?**

A: The sick leave rate of pay for employees who are paid an annual salary is determined as follows:
- Divide the annual salary by 52 to get the weekly salary;
- Divide the weekly salary by the number of hours the employee is regularly scheduled to work.
    - For employees who are **not exempt** from the overtime provisions of the Fair Labor Standards Act (FLSA) and California law, the weekly salary must be divided by 40 or fewer hours, even if the non-exempt employee regularly works more than 40 hours per week.
    - For employees who are **exempt** from the overtime provisions of the FLSA and California law (an Exempt Employee), the weekly salary

12

should be divided by 40 hours, unless there is evidence that the
Exempt Employee's regular work week is less than 40 hours.  In such
instances, the weekly salary should be divided by the number of hours
worked during a regular work week;

**53. Q: What is the sick leave rate of pay for an employee who has two jobs at different pay
rates for the same employer (or an employee whose rate of pay fluctuates for the
same job)?**

A: For an employee who has two jobs at different pay rates for the same employer, or for an
employee whose rate of pay fluctuates for the same job, the employer shall reimburse the
employee at a rate of pay equal to the scheduled rate(s) of pay for the job during which
sick leave is taken.

**54. Q: Are tips included when calculating the sick leave rate of pay for tipped employees?**

A: No.  The sick leave rate of pay is based only upon compensation paid by the employer.

**55. Q: When must employees be paid for sick leave?**

A: Sick leave must be paid no later than the payday for the next regular payroll period after
the sick leave was taken by the employee.  However, if the employer has a reasonable
verification requirement, the employer is not obligated to pay sick leave until the
employee has complied with the verification requirement.

**56. Q: Can employers, including employers covered by the Minimum Compensation
Ordinance, raise employee wages in lieu of providing paid sick leave?**

A: No.  The accrual of paid sick leave under the Ordinance may not be waived unless, per
Section 12W.9 of the Ordinance, it is expressly waived through a bona fide collective
bargaining agreement in clear and unambiguous terms.

**57. Q: Can employers offer their employees the option of "cashing out" unused paid sick
leave at the end of the year?**

A: No.  Employees may not "cash out" accrued paid sick leave hours unless, per Section
12W.9 of the Ordinance, it is expressly provided for through a bona fide collective
bargaining agreement in clear and unambiguous terms.

## Notice and Posting

**58. Q: Are employers required to post a notice informing employees of their rights under
the Ordinance?**

13

A: Yes. Employers must post a notice informing employees of their rights in a location where employees can read it easily. The notice, published in six languages, will be mailed to employers in January 2007 with the City's business registration mailing. Employers may also download the notice from OLSE's website: www.sfgov.org/olse/pslo.

## Employer Records

### 59. Q: What records do employers need to retain to be in compliance with the Ordinance?

A: Employers must retain records documenting hours worked by employees and paid sick leave taken by employees for a period of four years and must allow OLSE access to such records. In the case of Exempt Employees, employers must maintain records of work schedules and days worked, but do not need to maintain records of actual hours worked.

Employers must retain employee records for a period of four years even if the employee ceases to perform work in San Francisco or if there is a separation of employment.

## Exercise of Rights Protected; Retaliation Prohibited

### 60. Q: If an employer has an absence control policy that may lead to discipline, discharge, demotion, suspension, or any other adverse action, can an employee's use of paid sick leave count against him or her?

A: No. It is unlawful for an employer absence control policy to count paid sick leave taken under the Ordinance as an absence that may lead to or result in discipline, discharge, demotion, suspension, or any other adverse action.

### 61. Q: Can an employer retaliate against an employee for using paid sick leave?

A: No. It is unlawful for an employer or any other person to discharge, threaten to discharge, demote, suspend, or in any manner discriminate or take adverse action against any person in retaliation for exercising rights protected under the Ordinance. If an employee believes that s/he has been subjected to retaliation, the employee can either file a claim with OLSE or file a lawsuit in court against the employer.

### 62. Q: Can employees covered by a collective bargaining agreement file a claim with OLSE?

A: Yes. All employees, including those covered by a collective bargaining agreement, may file a claim with OLSE.

## Waiver through Collective Bargaining

**63. Q: Does the Ordinance apply to employees covered by a collective bargaining agreement?**

A: Yes. The Ordinance applies to all persons who perform work in San Francisco, including those employees covered by a bona fide collective bargaining agreement in effect as of February 5, 2007. A bona fide collective bargaining agreement is a written contract concerning wages, hours, and working conditions that is collectively bargained by an employer and a recognized union that represents the employees.

**64. Q: May a collective bargaining agreement waive some or all of the provisions of the Ordinance?**

A: Yes. The Ordinance permits waiver of some or all of its provisions through a collective bargaining agreement. The waiver must be in a bona fide collective bargaining agreement, must be express, and must be in clear and unambiguous terms. The parties to a collective bargaining agreement may negotiate any language they desire to effectuate a waiver, provided that the language meets the "clear and unambiguous" standard of the Ordinance. OLSE will not interfere with or participate in the negotiation of such language.

There may be different ways to accomplish an effective waiver in a collective bargaining agreement. One approach that OLSE would recognize for purposes of enforcement is as follows: "Waiver of San Francisco Paid Sick Leave Ordinance: To the fullest extent permitted, this agreement shall operate to waive any provisions of the San Francisco Paid Sick Leave Ordinance, San Francisco Administrative Code Section 12W, and shall supersede and be considered to have fulfilled all requirements of said Ordinance as presently written, and or amended during the life of this agreement."

### Business Assistance Resources

**65. Q: Where can employers get business assistance resources to help them comply with the Ordinance?**

A: The Mayor's Office of Economic and Workforce Development is prepared to provide business assistance resources to aid employers in complying with the Ordinance. The office can be reached at (415) 554-6969 or www.sfgov.org/moed.

*This document is intended to provide general guidance to employers and employees about the Paid Sick Leave Ordinance. Application of the Ordinance in particular circumstances may depend on the specific facts*

15

**Please email further questions to PSL@sfgov.org**
**Or call (415) 554-6271**
**www.sfgov.org/olse/pslo**